In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 19-2178

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DERONARTE NORWOOD,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cr-00648-1 — **Gary Feinerman**, *Judge.*

———————————

ARGUED SEPTEMBER 25, 2020 — DECIDED DECEMBER 14, 2020

———————————

Before RIPPLE, BRENNAN, and ST. EVE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Deronarte Norwood met a fifteen-year-old girl at a gas station in Indianapolis. Through a combination of drugs and manipulative affection, he enticed her to have sexual intercourse with him and then proceeded to prostitute her to countless men, all within a one-month timespan in 2015. A jury found him guilty of one count of attempted transportation of a minor across state lines with the intent that the minor engage in prostitution, in violation of 18

U.S.C. § 2423(a) and (e).[1] The district court denied Mr. Norwood's post-trial motions for a new trial and sentenced him to 330 months' imprisonment and five years' supervised release.

Mr. Norwood filed this timely appeal, in which he alleges error at several stages of the district court proceedings.[2] He now asks us to determine whether there is sufficient evidence to sustain the jury verdict. He also asks that we review various rulings made by the district court during trial as well as several matters that arose during the sentencing proceeding. After a review of the record and a study of the relevant authorities, we conclude that there is sufficient evidence to sustain the jury's verdict, that the district court's rulings during trial present no ground for reversal, and that the sentencing proceeding was free of error. Accordingly, we affirm the judgment of the district court in all respects.

# I

## BACKGROUND[3]

---

[1] The jurisdiction of the district court was premised on 18 U.S.C. § 3231.

[2] Our jurisdiction is premised on 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2).

[3] Neither the victim nor Mr. Norwood testified at trial. This account draws primarily from the trial record and sentencing hearing transcript, but we also include some information gleaned from the victim's grand jury testimony in order to provide context. During his sentencing hearing, Mr. Norwood objected to the district court's reliance on certain parts of the grand jury testimony, but the district court made explicit findings with respect to the portions it elected to rely upon. As we note below, the district court's consideration of the grand jury testimony during sentencing was proper. *See infra* note 38 and accompanying text.

Mr. Norwood first met the victim at a gas station in Indianapolis in April 2015 after she had run away from a state-run residential facility. Mr. Norwood provided the victim with marijuana and then took her to a hotel where he engaged in sexual intercourse with her. A day or two later, Mr. Norwood physically assaulted her and said that he could kill her.

In the month after they met, Mr. Norwood pressured the victim to engage in prostitution. As part of his efforts to market her services, he posted two advertisements on Backpage.com—the Internet's once leading marketplace for illicit sex services that has since been shut down by the United States Department of Justice. The advertisements showed the victim wearing only undergarments. Mr. Norwood set the first Backpage advertisement, posted on April 23, 2015, to target men in Chicago, Illinois, and Kenosha, Wisconsin. The second advertisement, created on May 8, 2015, and reposted on May 20, 2015, targeted men in Kenosha and Racine, Wisconsin. Both advertisements offered "out calls," meaning that the victim would go to the client's chosen location.

On May 8, the day Mr. Norwood posted the second Backpage advertisement, the victim received calls from eighty phone numbers with Wisconsin area codes. In total, the victim received over 4,000 phone calls and text messages from phone numbers with Wisconsin area codes during the period from May 1 through May 22, 2015. Of those calls and text messages, 3,457 came from phone numbers with the area code covering Racine and Kenosha, Wisconsin—the cities that Mr. Norwood set the second Backpage advertisement to target.

Throughout the time he attempted to prostitute her, Mr. Norwood also repeatedly had sexual intercourse with

the victim and continued to threaten and assault her. Mr. Norwood, who lived in Illinois, booked hotel rooms along the Illinois-Wisconsin border for the victim to meet men who responded to the Backpage advertisements. And Mr. Norwood took all of the money that the victim received from the customers, which at times totaled a few hundred dollars per day.

On May 17, 2015, Mr. Norwood drove the victim from Illinois to Kenosha, Wisconsin. Historical cell tower data showed both Mr. Norwood's and the victim's phones departing from the Chicago area and traveling to Kenosha. After a few hours in Kenosha, the victim's phone location information showed her traveling to Milwaukee. A short time later, Mr. Norwood's cell phone location information showed him in Milwaukee near the victim's phone. Cell phone records from the early morning hours on May 17 showed 254 contacts with the victim's phone number from phone numbers with Wisconsin area codes. Also during that time, Mr. Norwood sent a message to a friend stating that he was "out here getting money."[4] Mr. Norwood, on May 18, told a friend that he was in Milwaukee and asked the friend to send someone to his hotel.

Mr. Norwood and the victim traveled back to Illinois on May 18. He then booked a hotel room in Zion, Illinois, along the Illinois-Wisconsin border for that night. For the following nights, Mr. Norwood booked hotel rooms in Winthrop Harbor, Illinois, another town on the Illinois-Wisconsin border.

---

[4] Tr. at 490–91.

At those hotels, Mr. Norwood arranged for the victim to pro-
vide sex services to male customers.

On May 21, after Mr. Norwood had beaten her, the victim
called her Indiana-based foster mother for help. That same
day, police located the victim at a hotel in Winthrop Harbor,
Illinois. In the early hours of May 22, civilian employees with
the Indiana Department of Child Services transported the vic-
tim back to Indiana—first to a temporary shelter, then to a
hospital in Indianapolis where she underwent a medical eval-
uation.

A federal grand jury eventually indicted Mr. Norwood on
a single count of attempted transportation of a minor across
state lines with the intent that the minor engage in prostitu-
tion, in violation of 18 U.S.C. § 2423(a) and (e).[5] Mr. Norwood
proceeded to trial. There, the Government needed to prove
that (1) Mr. Norwood knowingly attempted to transport the
victim from Illinois to Wisconsin; (2) the victim was under the
age of eighteen; and (3) Mr. Norwood intended that the victim
engage in prostitution in Wisconsin.

The Government presented witness testimony and docu-
mentary evidence connecting Mr. Norwood to the Backpage
advertisements. Additionally, the Government presented tes-
timony and cell phone record information that showed Mr.
Norwood's movements and the victim's movements during

---

[5] The Government represented to the district court at sentencing that it
proceeded only on an attempt charge because the victim was too trauma-
tized to testify. In its original indictment, which it later superseded with
the single attempted transportation charge, the Government charged
Mr. Norwood with one count of violating 18 U.S.C. § 1591(a) and (b)(1),
and one count of violating 18 U.S.C. § 2423(a).

their month together, the contacts the victim received from phones with Wisconsin area codes, and several messages Mr. Norwood sent to friends via text message and Facebook messenger. The police officer who recovered the victim from the hotel in Winthrop Harbor also testified, as did the Indiana Department of Child Services staff who transported the victim back to Indiana from Illinois, and then took her for a medical examination.

A significant witness during Mr. Norwood's trial was Catana Philipps, the nurse who examined the victim at the Indiana hospital following her recovery. As part of Nurse Philipps's testimony, the Government offered a redacted copy of the victim's medical records from that examination. Mr. Norwood objected to the admission of those medical records, but the district court overruled the objection. The Government also offered a recorded jail call between Mr. Norwood and an unidentified female. In that call, Mr. Norwood made statements about prostituting a young "white girl."[6] Mr. Norwood again objected, and the Court again overruled him.[7]

At the close of the Government's evidence, Mr. Norwood moved for judgment of acquittal. The district court denied the motion. Mr. Norwood then called a single defense witness, his cousin. At the close of the defense's evidence, Mr. Norwood did not renew his motion for judgment of acquittal.

---

[6] R.205, Ex. 12 at 3.

[7] We defer discussion of the details of those evidentiary rulings for our assessment of the issues Mr. Norwood raises on appeal.

The jury returned a guilty verdict. Following the verdict, Mr. Norwood moved for a new trial on juror bias or misconduct grounds. The district court denied that motion, and, with the juror issue resolved, held a sentencing hearing. At the sentencing hearing, the district court calculated the advisory guidelines range of 360 months to life imprisonment, then imposed a sentence of 330 months' imprisonment. Mr. Norwood then timely filed this appeal.

## II

## DISCUSSION

Mr. Norwood takes issue with many aspects of his case, raising seven issues in total. As is often the case when a criminal defendant raises so many issues on appeal, some issues require more discussion than others. We start, as our case law instructs, with Mr. Norwood's sufficiency of the evidence challenge.[8] We then move through the remaining issues presented in roughly the chronological order that they occurred in the district court. For some issues, we supplement our discussion with additional, more-detailed factual background.

## A.

We turn first to Mr. Norwood's submission that the evidence of record is insufficient to sustain his conviction. In assessing this contention, we review the evidence in the light most favorable to the Government and will overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could have found guilt

---

[8] In this circuit, we review a sufficiency claim before examining more particular allegations of error. *See United States v. Hopper*, 934 F.3d 740, 754 n.50 (7th Cir. 2019).

beyond a reasonable doubt. *United States v. Clark*, 787 F.3d 451, 459 (7th Cir. 2015). When a defendant moves for a judgment of acquittal at the close of the Government's case but fails to renew that objection at the close of all evidence, however, we apply a more demanding standard and will reverse only if "we find a 'manifest miscarriage of justice' under the plain error standard of review." *United States v. Rea*, 621 F.3d 595, 601–02 (7th Cir. 2010) (quoting *United States v. Hensley*, 574 F.3d 384, 390 (7th Cir. 2009)). Because Mr. Norwood failed to renew his motion at the close of his evidence, the more demanding standard applies.

Under 18 U.S.C. § 2423(a), the Government must prove that: (1) the defendant knowingly transported an individual in interstate or foreign commerce; (2) the transported individual was under the age of eighteen; and (3) the transportation was with the intent that the individual engage in prostitution or any sexual activity that can be charged with a criminal offense. When, as here, the Government charges an attempt to violate § 2423(a), it does not need to prove that the defendant successfully transported the victim over state lines. *See* 18 U.S.C. § 2423(e). Instead, to convict the defendant of attempted transportation, the Government need only prove that the defendant took a substantial step toward transporting the victim to another state. Our case law defines a substantial step as "some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime." *United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008) (quoting *United States v. Manley*, 632 F.2d 978, 988 (2d Cir. 1980)).

Mr. Norwood now submits that "there are no facts [in the trial record] demonstrating that [he] took a 'substantial step'

towards *transporting* [the victim] across state lines *for prostitu-tion*."[9] The only evidence on this point, Mr. Norwood contends, was "cell tower data" showing him and the victim near each other in Wisconsin over the span of two days. That data, he submits, is not pinpoint accurate. Moreover, he continues, the Government's evidence that he and the victim stayed at a hotel on the Illinois-Wisconsin border would require the jury to speculate improperly about his intent to cross into Wisconsin.

The Government has a different view. It submits that because Mr. Norwood faced only an *attempt* charge, it simply needed to prove that he took a substantial step toward transporting the victim across state lines. Mr. Norwood, the Government observes, purposefully targeted the Backpage ads to Wisconsin cities. Mr. Norwood also advertised that the victim would make "out calls." Finally, he rented a hotel room on the Illinois-Wisconsin border to allow for easy travel to clients. The Government also invites our attention to *United States v. Cosby*, 924 F.3d 329 (7th Cir. 2019). There, we rejected a sufficiency of the evidence challenge by a defendant convicted under § 2423(a). The *Cosby* defendant had argued that the Government failed to prove he intended for the minor victim to engage in prostitution because there was a two-day gap after the defendant and victim crossed state lines before the prostitution commenced. *See id.* at 335–36. We held that evidence of pre-transport prostitution was relevant to the defendant's intent, particularly when the only relationship between the defendant and victim was "one of pimp to prostitute." *Id.* at 336.

---

[9] Appellant's Br. 26.

In denying Mr. Norwood's motion for judgment of acquittal at the close of the Government's evidence, the district court reviewed the evidence in the record from which a reasonable jury could find Mr. Norwood guilty. The district court specifically noted the Backpage advertisements targeting Wisconsin clients, the border-town hotel, the cell site data, and the victim's statements in the medical records. That evidence, the district court concluded, supported denial of Mr. Norwood's motion.

The district court's decision is solidly supported by the record. Our decision in *Cosby* also supports its decision. Mr. Norwood's relationship to the victim, like that of the *Cosby* defendant and minor victim, was solely "one of pimp to prostitute." The Backpage evidence of Mr. Norwood's efforts to prostitute the victim in the time leading up to the attempted transportation to Wisconsin was surely evidence of his intent to continue prostituting her once they crossed state lines.[10] Applying the more demanding standard of review, there certainly is no manifest injustice in affirming Mr. Norwood's conviction. The district court carefully considered the Government's evidence and specifically addressed Mr. Norwood's arguments regarding the statute's intent element.

**B.**

Having concluded that the evidence of record can sustain Mr. Norwood's conviction, we now examine the situations

---

[10] As the district court noted, there was substantial evidence in the record that Mr. Norwood transported the victim to Wisconsin. But because the Government only charged an attempt, it did not need to prove that Mr. Norwood and the victim actually crossed state lines.

that arose during the merits phase of the trial that Mr. Norwood believes made the proceedings unfair.

**1**.

Mr. Norwood's first claimed trial error involves the district court's admission of the victim's medical records. As we noted earlier, Nurse Philipps, who examined the victim upon her return to Indiana, testified during Mr. Norwood's trial. As part of her testimony, the Government offered a redacted copy of the victim's medical records from that examination. The medical records recited that the victim had told Nurse Philipps that she had sexual intercourse with "approximately 16 unknown males" during the prior five days and "too many to count" since meeting Mr. Norwood in April 2015.[11] The victim also told Nurse Philipps that she voluntarily had used marijuana and cocaine, was "tricked into using heroin" one week earlier, and had smoked a cigarette possibly laced with crack cocaine.[12] The Government redacted all references to Mr. Norwood; the records contained only the victim's description of her sexual history and her drug use in the days before the exam.

As we noted earlier, the victim did not testify at Mr. Norwood's trial. Relying on the Confrontation Clause and Federal Rule of Evidence 403, Mr. Norwood moved to exclude the victim's medical records. The district court denied the motion on both grounds. Addressing the Confrontation Clause issue, the district court noted that Nurse Philipps had testified that her questions, and the victim's answers, about the number of

---

[11] R.205, Ex. 2 at 2, 6.

[12] *See id.* at 5 (internal quotation marks omitted).

sexual partners and the types of sexual encounters were for
the primary purpose of diagnosis and medical treatment.
Nurse Philipps also testified that questions and answers
about the victim's drug use, including whether the drug use
was voluntary, were for the primary purpose of medical treat-
ment and avoiding adverse medication interactions. On the
basis of this testimony, the district court ruled that the re-
dacted medical records were nontestimonial.

On the Rule 403 objection, the district court determined
that the victim's statements in the medical report were highly
probative of Mr. Norwood's intent that the victim engage in
prostitution. Although Mr. Norwood pointed to the victim's
inability to indicate specifically the dates on which certain
sexual encounters and drug use had occurred, the district
court concluded that such an argument was one of weight,
not admissibility.

Mr. Norwood now renews his Confrontation Clause and
Rule 403 challenges to the admission of the victim's medical
records. Because the Confrontation Clause issue requires the
most attention, we will address that issue before turning to
the Rule 403 issue.

**a.**

The Confrontation Clause provides: "In all criminal pros-
ecutions, the accused shall enjoy the right ... to be confronted
with the witnesses against him." U.S. Const. amend. VI. We
review Confrontation Clause challenges de novo. *See United
States v. Thompson*, 286 F.3d 950, 961 (7th Cir. 2002).

At one time, the Supreme Court interpreted the Confron-
tation Clause to allow for the admission of out-of-court state-
ments by an unavailable witness, provided the statements

possessed an "adequate 'indicia of reliability.'" *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). In practice, statements bore sufficient indicia of reliability if they fell into an established hearsay exception or bore a "particularized guarantee[] of trustworthiness." *Id.* Then came *Crawford v. Washington*, 541 U.S. 36 (2004), which marked a dramatic change in the Supreme Court's Confrontation Clause jurisprudence. In *Crawford*, the Court sought to return the Confrontation Clause to its historical roots and tracked the right to confront one's accusers from 16th century England, to the 1603 trial of Sir Walter Raleigh for treason, to the Colonial-era admiralty cases brought under the Stamp Act, to the founding-era debates surrounding the drafting of our Constitution. *Id.* at 42–49.

This history, the Court observed, supported two conclusions. First, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Id.* at 50. Consistent with that principal concern, the Court read the Clause's text to guarantee a defendant the chance to confront "witnesses" against him. And "witnesses," the Supreme Court observed, are those "who bear testimony." *Id.* at 51 (internal quotation marks omitted). Testimony "typically [means] '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* (second alteration in original) (quoting 2 N. Webster, *An American Dictionary of the English Language* (1828)).

The Court's second conclusion from its historical study was that the Confrontation Clause prohibits the admission of testimonial statements by a witness who does not testify at the defendant's trial. That is, unless the "declarant is

unavailable," and even then "only where the defendant has
had a prior opportunity to cross-examine" the absent declar-
ant. *Id.* at 59. Moreover, it is not enough for the absent wit-
ness's statement to fall into an established hearsay exception.
"[O]nly those exceptions [to confrontation] established at the
time of the founding" will permit admission of an out-of-
court testimonial statement by a non-testifying declarant. *Id.*
at 54 (citing *Mattox v. United States*, 156 U.S. 237, 243 (1895)).

*Crawford* therefore requires, as a threshold matter, that a
court focus on whether a statement is testimonial or nontesti-
monial. This issue has occupied courts ever since the advent
of *Crawford*. "Whatever else the term ['testimonial'] covers, it
applies at a minimum to prior testimony at a preliminary
hearing, before a grand jury, or at a former trial; and to police
interrogations." *Id.* at 68. Because *Crawford*'s underlying facts
involved statements made during a formal police interview,
the admission of those statements at trial without confronta-
tion surely violated the Sixth Amendment. *Id.* Because it
could decide the case on that minimalist definition, the Court
did not have occasion to "spell out a comprehensive defini-
tion of 'testimonial.'" *Id.*

The Court's subsequent cases built a framework around
*Crawford*'s historically grounded discussion of what makes a
statement "testimonial." In *Davis v. Washington* and *Hammon
v. Indiana*, 547 U.S. 813, 822 (2006), two cases consolidated for
decision, the Supreme Court introduced the "primary pur-
pose" test. Under that test, "[s]tatements are nontestimonial
when made in the course of police interrogation under cir-
cumstances objectively indicating that the primary purpose of
the interrogation is to enable police assistance to meet an on-
going emergency." *Id.* By contrast, statements "are

testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

Two years after it decided *Davis*, the Court again addressed the Confrontation Clause's scope in *Giles v. California*, 554 U.S. 353 (2008). There, the Court reiterated that "only *testimonial* statements are excluded by the Confrontation Clause." *Id.* at 376. That means "[s]tatements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules." *Id.* A year later, the Court held in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321 (2009), that business records, which would include medical records, are typically nontestimonial. Documents kept in the regular course of business, therefore, generally do not implicate the Confrontation Clause. *Id.* That is, of course, unless "the regularly conducted business activity is the production of evidence for use at trial." *Id.*

*Giles* and *Melendez-Diaz* fit with the primary purpose test: the *reason* for the document's production places it within or outside of the Confrontation Clause's purview. Later, in *Michigan v. Bryant*, 562 U.S. 344 (2011), the Supreme Court further elaborated on the primary purpose test. It explained that under the primary purpose test, courts must ask whether, viewed objectively and in full context, the primary purpose of the declarant's statements was to "creat[e] an out-of-court substitute for trial testimony." *Id.* at 358. The Supreme Court's application of that test in *Hammon* and *Davis* had focused on the existence of an "ongoing emergency." *Id.* at 358. Yet in *Bryant*, the Court cautioned that "what *Davis* meant by

'ongoing emergency' should not be taken to imply that the existence *vel non* of an ongoing emergency is dispositive of the testimonial inquiry." *Id.* at 366. Instead, an "ongoing emergency" is simply one consideration when applying the primary purpose test. *Bryant* made clear that the *totality of the circumstances* guides the primary purpose test, not any one factor.

There are two additional lessons from *Bryant* relevant to our decision today. First, when employing the primary purpose test, courts should consider the "formality" of the circumstances in which the declarant made the statements. *Id.* Formal questioning at a police station, as occurred in *Crawford*, will elicit testimonial statements. On the other hand, questioning in less formal circumstances is less likely to elicit testimonial statements. *Id.* at 366, 377. Second, "the statements and actions of *both* the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Id.* at 367 (emphasis added). This approach is necessary because "[i]n many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers." *Id.* at 367–68.

On this final point—the need to focus on both questions and answers—the Supreme Court observed that examining both sides of the conversation takes on added significance when the questioner may have mixed motives. *Id.* ("Police officers in our society function as both first responders and criminal investigators. Their dual responsibilities may mean that they act with different motives simultaneously or in quick succession."). Therefore, the questioner's identity, as well as the "tenor" of the questioning, matters for the primary

purpose test. *Id.* at 369. We must scrutinize the primary purpose behind the questioner's questions and declarant's answers from the perspective of an objective observer. The questioner's subjective understanding does not control. *Id.* at 369–70.

The Supreme Court's decisions from *Crawford* through *Bryant* involved statements made to law enforcement personnel.[13] It was not until *Ohio v. Clark*, 576 U.S. 237 (2015), that the Supreme Court had an opportunity to explain how the primary purpose test applies to statements made to someone who is not a law enforcement officer. In *Clark*, a preschool teacher noticed injuries to one of her students, L.P., a three-year-old boy. *Id.* at 240–41. The teacher alerted a colleague and together they questioned L.P. about the cause of his injuries—asking directly: "Who did this? What happened to you?" *Id.* (quotation marks omitted). The young child identified Darius Clark, his mother's boyfriend, as the person who hurt him. *Id.* at 241. The teachers notified authorities of the suspected child abuse, which eventually led to Clark's arrest and indictment. *Id.* at 241–42. At Clark's trial, the trial court deemed L.P. "not competent to testify." *Id.* at 242. Under Ohio's rules of evidence, however, "reliable hearsay [statements] by child abuse victims" are admissible. *Id.* at 242 (citing Ohio R. Evid. 807). Clark moved to exclude L.P.'s out-of-court identification under the Confrontation Clause, but the trial court denied his motion. *Id.* After hearing L.P.'s statements to his teachers, the jury convicted Clark. The

---

[13] Although *Davis* involved statements made to a 911 operator, the Court treated those statements as made to a law enforcement officer, given the operator's interrogation of the caller. *Davis v. Washington*, 547 U.S. 813, 823 n.2 (2006).

Supreme Court of Ohio reversed the conviction, holding that L.P.'s statements to his teachers were testimonial.

The Supreme Court of the United States granted certiorari and reversed the Ohio decision. *Id.* at 243. The Supreme Court reviewed its post-*Crawford* decisions and reiterated its past holdings that "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." *Id.* at 245. But the Court added two qualifiers to its discussion of the primary purpose test. First, it noted that post-*Crawford* decisions also "recognized that the Confrontation Clause does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the time of the founding." *Id.* at 246 (citing *Giles*, 554 U.S. at 358–59; *Crawford*, 541 U.S. at 56 & n.6). Second, the Supreme Court observed that "the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause." *Id.*; *but see id.* at 251–52 (Scalia, J., concurring in the judgment).

Qualifiers aside, the Supreme Court applied the primary purpose test to Clark's case. The Court declined to place statements to people other than law enforcement categorically outside of the reach of the Confrontation Clause. But the Court cautioned that "such statements are much less likely to be testimonial than statements to law enforcement officers." *Id.* at 246 (majority opinion). The Court then concluded that the questioning by L.P.'s teachers occurred in the context of an ongoing emergency; the teachers needed to know whether L.P. was at risk of returning to his abuser at the end of the school day. *Id.* at 247. The Court also concluded that the primary purpose of the teachers' questions was to protect L.P., not to gather evidence for a prosecution. *Id.* And the

conversation between L.P. and his teachers was spontaneous and occurred in the preschool lunchroom, undoubtedly an informal setting. Finally, the Court observed that although statements made to individuals who are not law enforcement may fall within the Confrontation Clause's scope, the questioner's identity remains an important part of the interrogation context. Since the primary purpose test looks at the totality of the circumstances, that L.P. made the statements to his preschool teachers weighed heavily in the analysis. "It is common sense," the Court noted, "that the relationship between a student and his teacher is very different from that between a citizen and the police." *Id.* at 249.

The Court then went a step beyond simply applying the primary purpose test. It wrote that L.P.'s age "fortifie[d]" its conclusion that his statements identifying Clark were not testimonial. *Id.* at 247–48. "Statements by very young children," the Court observed, "will rarely, if ever, implicate the Confrontation Clause." *Id.* That is because very young children simply do not understand the legal implications of their statements. *Id.* Notably, the Court then pointed to historical practice in 17th and 18th century England, which permitted hearsay in child rape prosecutions when the child was incompetent to testify. *Id.* In their concurrence in the judgment, Justices Scalia and Ginsburg also concluded that L.P.'s age "refutes the notion that he is capable" of making testimonial statements. *Id.* at 251 (Scalia, J., concurring in the judgment). Like the majority, Justices Scalia and Ginsburg observed that, at common law, young children were rarely competent to

testify, so courts admitted their hearsay statements.[14] *Id.* at 251–52.

No decision from the Supreme Court of the United States squarely addresses the situation before us in this case: statements made by a minor, though not a very young child, to a sexual assault nurse examiner ("SANE"). Statements made to a SANE in the context of a part-medical, part-forensic examination are difficult to examine under the primary purpose test. SANEs are medical professionals, but they also typically receive special training to aid law enforcement in sexual assault investigations. Sexual assault examinations conducted by a SANE, then, can serve both a medical and investigative function.[15] Consequently, courts applying the context-specific primary purpose test to statements made by a non-testifying victim during one of these examinations must tread carefully.

There is some, but not much, post-*Crawford* case law from our circuit and others applying the primary purpose test to statements made to a SANE. In *United States v. Bordeaux*, 400 F.3d 548 (8th Cir. 2005), the Eighth Circuit held that statements made to a forensic interviewer by a young child who accused the defendant of sexually abusing her were testimonial. There, law enforcement officials referred the victim to a

---

[14] Both the majority and concurring Justices in *Clark* drew from scholarship on the historical treatment of child victims. *See Ohio v. Clark*, 576 U.S. 237, 248 (2015) (citing Thomas D. Lyon & Raymond LaMagna, *The History of Children's Hearsay: From Old Bailey to Post-Davis*, 82 Ind. L.J. 1029, 1030, 1041–44 (2007); John H. Langbein, *The Origins of Adversary Criminal Trial* 239 (2003)); *id.* at 251 (Scalia, J., concurring in the judgment).

[15] *Accord Michigan v. Bryant*, 562 U.S. 344, 367–68 (2011) (noting the potential for a questioner to act with multiple purposes).

center for child evaluation. At the center, a forensic inter-
viewer asked the victim questions about the assault, and then
a physician conducted a medical exam. *Id.* at 555. Even
though there may have been some medical purpose, the
Eighth Circuit concluded that the purpose of the forensic
exam was for gathering evidence to use at trial. *Id.* at 557.

In a recent habeas case, *Ramirez v. Tegels*, 963 F.3d 604 (7th
Cir. 2020), we were required to apply post-*Crawford*, pre-*Bry-
ant* case law and consider the Confrontation Clause's applica-
tion to statements made by a victim to a SANE. The petition
in *Ramirez* centered on appellate counsel's failure to raise a
Confrontation Clause challenge to the admission of a child
victim's out-of-court statements. There, the defendant stood
convicted of sexually assaulting his stepdaughter on two oc-
casions—once when she was seven years old, and the second
time a year later. *Id.* at 607. As part of the ineffective assistance
inquiry, we commented on how the primary purpose test ap-
plied to two sets of statements that the victim had made.

The first were statements by the victim made directly to
detectives investigating a sexual assault report filed by the
victim's mother. The State conceded that these statements
were testimonial because the defendant already had been ar-
rested, the statements were not spontaneous, and there was
no risk that the victim would be released to the defendant's
custody; in short, there was no ongoing emergency. *Id.* at 615.

The second set of statements were made by the victim to
hospital staff during a sexual assault exam. We noted that the
victim and her mother did not go to the hospital on their own;
a detective drove them there. *Id.* We also noted that a detec-
tive was in the room for at least part of the examination. *Id.*
Still, we "acknowledge[d] that [the victim's] statements

during her examination regarding what happened to her and whether she was hurting may have been for the primary purpose of receiving medical treatment rather than for prosecutorial purposes." *Id.* at 615–16. At the same time, her "other statements, such as those about where the assault happened and the identity of her abuser," were for the primary purpose of proving past events for later use at trial. *Id.* at 616. We also noted that statements about the first sexual assault, which occurred a year before the examination, were particularly likely to be testimonial. *Id.* Given that *Ramirez* only required us to decide whether appellate counsel was ineffective for failing to raise a Confrontation Clause issue, we declined to "determine precisely which statements would not have been admitted under the Confrontation Clause." *Id.* Moreover, because *Ramirez* was a habeas petition, we applied the Confrontation Clause case law as it existed in 2007, the year that the defendant's conviction became final. Thus, the law applicable in *Ramirez* predated the Supreme Court's decision in *Ohio v. Clark*, 576 U.S. at 237.

Since the Supreme Court's decision in *Clark*, there have been few decisions from federal courts of appeals or district courts addressing circumstances like those presented in this case. One of the few is the Fifth Circuit's opinion in *United States v. Barker*, 820 F.3d 167 (5th Cir. 2016), which discussed statements made by a four-and-a-half-year-old victim to a SANE about sexual abuse by the defendant. *Id.* at 169. The Fifth Circuit noted that the victim made the statements during the SANE's examination—which involved obtaining a medical history, as well as conducting a full physical examination—and occurred outside the presence of law enforcement. *Id.* Although the SANE testified that the purpose of the exam

was to ensure the victim's well-being, the SANE also produced a report that was then provided to law enforcement. *Id.*

The Fifth Circuit held that the child's statements to the SANE were not for the primary purpose of creating an out-of-court substitute for trial testimony. The court relied heavily on *Clark*, noting that in both cases there was an ongoing emergency because the questioner needed to make sure the child would not be placed back in harm's way after the questioning. *Id.* at 171. The Fifth Circuit also observed that, although more formal than the preschool lunchroom in *Clark*, the hospital setting for the SANE's exam was "far different" from a police stationhouse interrogation. *Id.* at 172. The Court noted that the SANE's special certifications did not transform her into a law enforcement officer; she was a medical professional above all else. *Id.* Finally, the Fifth Circuit noted the victim's young age and observed, consistent with *Clark*, that a young child will rarely make testimonial statements. *Id.* at 171. The child's statements to the SANE identifying the abuser and describing the abuse, therefore, were not testimonial.

In addition to the few federal cases applying the primary purpose test to a victim's statements made to a SANE, there is a considerable body of state court decisions on the matter. A pair of opinions from the Supreme Court of Kansas provide helpful examples as well as a survey of the state decisional landscape. In *State v. Miller*, 264 P.3d 461 (Kan. 2011), the court held that a four-year-old victim's statements to a SANE were nontestimonial because the primary purpose of the questions and statements were for medical treatment, not criminal prosecution. Context drove the court's conclusion: although there was no ongoing emergency, the victim complained of pain,

her mother independently sought medical treatment, the SANE provided medical treatment, and the victim's young age made it unlikely she would understand the exam to be about gathering forensic evidence. *Id.* at 489–90. The same day it decided *Miller*, the Supreme Court of Kansas also decided *State v. Bennington*, 264 P.3d 440 (Kan. 2011). There, the court held that a seventy-seven-year-old rape victim's statements to a SANE were testimonial. As in *Miller*, the totality of the circumstances drove the decision in *Bennington*: there was no ongoing emergency; the victim was an adult; during the first stage of the SANE's examination, a police officer was present and asked the victim questions; and during the second stage of the examination, between only the victim and SANE, the SANE posed questions from a police questionnaire. *Id.* at 453–54.

In *Miller*, the Supreme Court of Kansas scoured the body of post-*Crawford* state court case law involving statements made by a victim to a SANE or other medical professional. *Miller*, 264 P.3d at 479–82 (collecting cases). Because Confrontation Clause challenges are so fact-specific and context-specific, the court noted that it is difficult to distill a general rule from the large body of case law. *Id.* at 482. But the court observed that when the medical provider or SANE can testify "that the question of 'what happened' was necessary for [medical] treatment … the statements [by the victim] are nontestimonial even if there is a secondary purpose of preserving evidence." *Id.* When the opposite is the case—there is "little to no medical purpose for the examination and the interview is conducted by a [SANE] primarily for forensic purposes"—the victim's statements are likely testimonial. *Id.* And if law enforcement officers participate in the SANE's examination,

"there is a strong trend toward finding the victim's statements testimonial." *Id.*

Our own review of the cases collected in *Miller* leads us to the same conclusions. *Compare, e.g.*, *State v. Slater*, 939 A.2d 1105, 1118 (Conn. 2008) (adult sexual assault victim's statement to nurse held nontestimonial when she described her injuries and "[n]one of [her] statements related to the identity of her assailant nor to other details of the crime unrelated to medical treatment"), *with, e.g.*, *State v. Romero*, 156 P.3d 694, 698 (N.M. 2007) (victim's statement to SANE held testimonial when it identified the defendant as her attacker, law enforcement arranged victim's examination by SANE weeks after the assault, and there was no medical purpose to the examination). The same general trends have held true in state court decisions following *Clark*—although cases involving very young children now tend to have an added layer of discussion. *See, e.g.*, *In re J.C.*, 877 N.W.2d 447, 458 (Iowa 2016); *id.* at 461–63 (Wiggins, J., dissenting). We also detect another trend: when a victim's entire statement presents testimonial portions alongside nontestimonial portions, state courts broadly approve of breaking out the black marker and redacting the testimonial parts—"[o]ften this will require examination of individual questions and responses." *See Miller*, 264 P.3d at 487.

Mr. Norwood's case requires that we contribute to the body of post-*Crawford* and post-*Clark* case law on how the primary purpose test applies to statements made by an abuse or assault victim to a medical provider. The framework we employ here is intended to address some of the recurring questions that arise when a victim of abuse or assault makes statements to a medical professional during an examination that

serves, to one degree or another, both a medical and investigatory purpose.

We start by recalling that not every statement made by an abuse or assault victim to a medical professional implicates the Confrontation Clause. A victim's statements to his or her physician in the course of a routine checkup, just like off-hand comments to friends or neighbors, are not testimonial. *See Giles*, 554 U.S. at 376. Those circumstances bear no resemblance to the out-of-court interrogations that the Confrontation Clause guards against.

On the other hand, when the medical provider examines the victim because of suspected abuse or assault, the victim's statements may be testimonial. In this context, courts should ascertain whether the statements were made in the midst of an ongoing emergency. The Supreme Court's case law is clear that statements made as part of an ongoing emergency do not have the primary purpose of creating an out-of-court substitute for testimony. *See Davis*, 547 U.S. at 822. One possible example of an ongoing emergency is when the medical provider believes that the victim may be released to the custody of whomever harmed him or her. *See Clark*, 576 U.S. at 246–47 (fear that the child would return at the end of the school day to his abuser was an ongoing emergency). The existence of an ongoing emergency is not necessary to meet the primary purpose test, but the Supreme Court's case law tells us it is sufficient.

In many instances the examination will *not* occur in the context of an ongoing emergency, and the court must evaluate the circumstances surrounding the victim's statement. The Supreme Court observed in *Bryant*, 562 U.S. at 366, that formality is a factor in the primary purpose test. Where the

medical provider speaks to the victim, therefore, matters. A medical examination that takes place at a police station is very different from one that takes place at a hospital. Police stations invoke formality, for purposes of the Confrontation Clause, in a way that hospitals do not. A tougher call is between an exam at a hospital and one at a center with a special focus on abuse or assault victims. Yet even if the place where the exam occurs has a special focus on victims, statements made during an examination should not be automatically or even presumptively labeled testimonial. Instead, further inquiry into the extent and manner of patient care is necessary.

It also is important to consider the identity of the victim, questioner, and others present when the statements were made. *Bryant*, 562 U.S. at 367–70. The victim characteristic that has most frequently impacted a court's primary purpose test inquiry is the victim's age. Though *Clark*'s discussion of a child's age may not have been essential to the Court's holding, it is still informative. A very young child will rarely make statements for the primary purpose of creating an out-of-court substitute for testimony; they are typically incapable of forming that purpose. Older children and adults, of course, typically have a better understanding that allegations of criminal conduct can lead to a prosecution. Courts should be careful, therefore, to examine the objective circumstances surrounding an older child's or adult's statements during a SANE's exam.

As for the questioner's identity, there are three scenarios to consider. First, the overwhelming trend after *Crawford* is that when law enforcement is present at the examination and asks the victim questions, the victim's responses are testimonial. *See, e.g.*, *Bennington*, 264 P.3d at 453–54. In those

instances, the hospital room is, for our purposes, transformed into a stationhouse. Second, when law enforcement officers are in the exam room, but do not participate in the questioning, their presence still weighs on the analysis. A victim hearing questions from and giving answers to a nurse who is standing beside a police officer is objectively more likely to understand the statements to be part of an investigation. But an officer's mere presence should not halt the inquiry in the same way that an officer's questioning would. Finally, when the only people in the room are the medical provider and the victim, the analysis is more straightforward. A nurse and doctor are quite different from a police officer. Absent additional evidence, physicians and nurses' primary concern is the treatment of their patients; criminal investigation is a secondary concern.

When the circumstances, viewed objectively, indicate multiple purposes behind the medical professional's questions and the victim's answers, the trial court should consider employing an in limine process to identify and redact the testimonial portions of the victim's statements. *See Davis*, 547 U.S. at 829 (Trial courts "should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence."). Careful redactions can even parse the testimonial from the nontestimonial parts of a sentence. The primary thrust of the court's inquiry must be whether there is an objectively ascertainable medical reason for the inquiry. A medical provider, faced with a victim who has suffered assault or injury, needs to know what happened. The primary purpose for asking what happened, therefore, is to provide medical treatment, not to further an investigation. *See Barker*, 820 F.3d at 171. The same goes for the question of when an

injury occurred, since the answer may well dictate the course of treatment.[16]

With this framework in mind, we turn to the facts of Mr. Norwood's case. We start with the obvious: the victim did not make the incriminating statements about Mr. Norwood during a routine medical examination. Rather, the police recovered her in Winthrop Harbor, and then case workers from the Indiana Department of Child Services took her to the hospital in Indianapolis. Nor did the victim make the challenged statements during an ongoing emergency. Unlike the child in *Clark*, there was no risk that the victim would be released from the medical exam to Mr. Norwood's custody.

We turn next to the identities of all involved in the victim's hospital examination. The victim is a minor, but she is not a young child. *Clark*'s observation that very young children rarely will act with the primary purpose of furthering a criminal investigation therefore does not apply here. Given that the police recovered her from the hotel in Winthrop Harbor only a day earlier, it is reasonable that she would recognize that her statements about Mr. Norwood to Nurse Philipps might be used in a later criminal prosecution. Moreover, as we note in some detail below, the consent form that Nurse

---

[16] There is some temporal limitation, however, when it comes to questions about when an injury occurred. Asking about an assault or injury that occurred a year earlier is different from asking about one that occurred much closer to the time of the examination. In the former scenario, there would need to be a greater showing that, viewed objectively, questioning when an old injury occurred had the primary purpose of treatment, not criminal investigation. *Accord Ramirez v. Tegels*, 963 F.3d 604, 616 (7th Cir. 2020) (distinguishing questions about sexual abuse a year earlier from questions about more recent sexual abuse).

Philipps tendered explicitly informed the victim that the information obtained during the examination would be shared with the police if the victim reported an assault.

Nurse Philipps, the SANE who conducted the victim's exam, testified that there were no police officers present during the exam. Civilian employees of the Indiana Department of Child Services transported the victim from the police station in Illinois back to Indiana, first to an emergency shelter, then to the hospital. Police officers did not participate in or observe the victim's examination.

Nurse Philipps's identity and the tenor of her questions also inform how the objective observer would perceive the examination. *See Bryant*, 562 U.S. at 369. Nurse Philipps testified that, at the time of the victim's exam, her responsibilities as a registered nurse at the hospital included conducting sexual assault examinations and completing forensic medical reports. Nurse Philipps also testified that she was responsible for working with physicians to develop a specialized plan of care. Before the examination, Nurse Philipps gave the victim a "Forensic Medical Record/Sexual Assault Exam" form to look over and sign. That form asked for the victim's consent to an "examination by a specially trained Sexual Assault Nurse Examiner to discover and preserve evidence of the assault."[17] The form also noted that the medical providers would only share evidence with law enforcement if the victim chose to report the assault. As for the exam itself, Nurse Philipps started by taking the victim's medical history. She next examined the victim for injuries or other ailments

---

[17] R.205, Ex. 2 at 1.

requiring treatment. Then she asked the victim about her recent sexual history and drug use.

Under these circumstances, we conclude that the victim's sexual assault examination served both medical and investigatory purposes. As the Supreme Court explained in *Davis*, in these circumstances, it is often possible to redact testimonial parts of a conversation. Here, the district court accepted the Government's redacting of the victim's medical records to remove her statements identifying Mr. Norwood. Because identity statements are rarely for the primary purpose of medical treatment, redacting Mr. Norwood's name was a prudent, and here necessary, approach. Similarly, the Government redacted the victim's description of where her sexual encounters with Mr. Norwood and other men had occurred. Location information is also unlikely to matter for medical purposes, so that, too, was a prudent and necessary redaction.

After the Government's redactions, all that was left in the victim's medical reports were her descriptions of what had happened and when it had happened. Her answers to questions about what happened involved detailed descriptions of her sexual history from when she met Mr. Norwood roughly a month earlier to when the police recovered her in Winthrop Harbor on May 21, 2015. As Nurse Philipps testified, the number and types of sexual encounters mattered a great deal to determining the best course of medical treatment. The same is true for the victim's description of her drug use over that timeframe. Nurse Philipps noted that it was essential to know what substances the victim had ingested, as well as whether her drug ingestion was entirely voluntary. It was also important for Nurse Philipps to know when certain sexual

encounters and drug use occurred, since the timing could alter the victim's treatment.

In some parts of the victim's medical records, the Government redacted entire questions. In others, the Government left most of a sentence but redacted Mr. Norwood's name. Both approaches can be appropriate; the trial court must carefully exercise its discretion in individual circumstances. Here, the district court properly ensured that the Government excised the parts of the victim's statements that lacked the primary purpose of medical treatment. In essence, the jury only considered the victim's statements to Nurse Philipps about what had happened and when. Those statements were for the primary purpose of medical treatment. They are therefore non-testimonial, and the district court's admission of the victim's redacted medical records did not violate Mr. Norwood's Sixth Amendment right to Confrontation.

**b.**

Mr. Norwood also submits that the district court abused its discretion in admitting the redacted hospital records because they should have been excluded under Federal Rule of Evidence 403. That rule provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice." Fed. R. Evid. 403. Generally, we review a district court's admission of evidence only for abuse of discretion. But when it comes to "the necessarily context-sensitive evaluation of a claim under Rule 403, 'we give special deference' to the district court's findings and reverse only when 'no reasonable person could take the view adopted by the trial court.'" *United States v. LeShore*, 543 F.3d 935, 939 (7th Cir. 2008) (quoting *United States v. Cash*, 394 F.3d 560, 564 (7th Cir. 2005)).

In Mr. Norwood's view, the admission of these records carried a high probability of prejudice because the statement that the victim, a minor, had endured numerous acts of prostitution was sure to elicit a great deal of sympathy from the jury. The possibility of such prejudice, he says, substantially outweighs whatever probative value this evidence might contribute.

We begin by noting that the evidence was relevant and probative on the issue of Mr. Norwood's intent, an important element in the attempt charge that the Government had to prove to the jury by circumstantial evidence. The medical records also assisted the jury in placing the victim and Mr. Norwood together during the period when she told Nurse Philipps she had engaged in multiple sex acts with unknown men. The victim's confirmation of her drug ingestion also aided the jury in determining whether Mr. Norwood was referring to the victim in his jail call discussion of prostitution.

Moreover, the district court conducted a thorough Rule 403 analysis. It noted the victim's inability to specify exactly when events occurred, but found the timing to be an issue of weight, not admissibility. The district court stated: "[E]ven though there may have been some difficulty with [the victim's] providing a chronological order for the events, the interview notes reflect that she was pretty clear about what happened over the prior five days in term[s] of the number [of] men then that she had sexual encounters with."[18] Thus, the record shows the district court carefully weighing the probity and prejudice of the medical records. Ultimately, the district

---

[18] Tr. at 316–17.

court decided that the risk of unfair prejudice did not substantially outweigh the records' relevance.

This sort of evidence may well have shocked the sensibilities of some of the jurors. But most evidence in a trial such as this one will have such an effect. The jurors in this case had to perform a very unpleasant duty. The fact remains, however, that the evidence was relevant and probative on several vital issues that the jury had to decide.

We owe a special deference to the district court's Rule 403 balancing. Here, the record reveals that the district court undertook a conscientious evaluation of the competing concerns. Its conclusion was far from an abuse of discretion.

**2.**

During the trial, the Government also tendered for admission into evidence a recorded jail call between Mr. Norwood and an unidentified female. In that recorded call, Mr. Norwood stated that he was "pimping" a young "white girl" to whom he had given cocaine.[19] Mr. Norwood also described the girl he was "pimping" as a runaway and said that the girl brought in $800–$1,000 per day. In addition, Mr. Norwood stated that someone gave the "white girl" "a whole crack rock" in a cigarette.[20]

Invoking Rule 403, Mr. Norwood objected to the admission of the jail call. First, he contended that it was not clear from the recorded conversation that the reference was to the victim; he suggested that she was not the "white girl"

---

[19] R.205, Ex. 12 at 2–3.

[20] *Id.* at 3.

mentioned in the call.[21] Second, Mr. Norwood contended that the conversation in the jail call was of limited relevance to § 2423(a)'s intent element—which was the Government's basis for offering the recorded call—and highly prejudicial to him because of the coarse tenor of the discussion captured in the recording.

The district court denied Mr. Norwood's objection. It concluded that there was sufficient overlap between the description of the "white girl" in the recorded call and the information in the victim's medical records (particularly her age, runaway status, and drug use) to permit the jury to conclude that Mr. Norwood was discussing the victim. As for the call's relevance to the intent to engage in prostitution element, the district court noted that the "pimping" Mr. Norwood described in the call, even if wholly undertaken in Illinois, was evidence of Mr. Norwood's intent to continue the same conduct in Wisconsin.[22]

We cannot quarrel with the district court's balancing of how helpful the evidence might be to the jury against any possible prejudice to Mr. Norwood. The court's methodology was both careful and precise. It certainly cannot be characterized as an abuse of discretion.

**3.**

Mr. Norwood also asks that we review a matter that arose during closing arguments. Toward the end of Mr. Norwood's closing argument, defense counsel referenced the thousands of contacts between the victim's cell phone and Wisconsin

---

[21] R.111 at 3.

[22] Tr. at 272–73.

phone numbers. Defense counsel submitted that the lack of any testimony from the victim's alleged Wisconsin clients suggested that Mr. Norwood was not prostituting her in that state.

In rebuttal, the Government stated:

> I want to be very clear about something. The government has the burden in this case. We need to prove this case beyond a reasonable doubt, and the defense, they don't have to prove anything or present any evidence. But they have subpoena power like the government. They had those telephone numbers of those clients from Wisconsin, and they could have sub-poenaed them to testify at this trial, the same power to do that.[23]

Defense counsel did not object to the prosecutor's rebuttal. But now, on appeal, Mr. Norwood claims that prosecutorial misconduct during rebuttal deprived him of due process. When a defendant does not timely object, we review allegedly improper statements by a prosecutor during closing argument for plain error. *United States v. Klemis*, 859 F.3d 436, 441 (7th Cir. 2017). "The challenged remarks cannot be plain error unless [the defendant] probably would have been acquitted if the prosecutor had not made them." *Id.* (citing *United States v. Della Rose*, 403 F.3d 891, 906 (7th Cir. 2005)).

In *Darden v. Wainwright*, 477 U.S. 168 (1986), the Supreme Court articulated a two-step framework for addressing

---

[23] Tr. at 697.

challenges to prosecutorial statements. First, we ask whether the statements in question were improper. If they were improper, we then ask whether the statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (quotation marks omitted) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Mr. Norwood challenges two of the Government's statements during closing argument. First, he submits that the Government's reference to the defense's subpoena power improperly shifted the burden of proof. Second, he contends that the prosecutor's statement that the victim had sex with five men per day "because that is what the defendant intended her to do"[24] mischaracterized her statements in the medical records.

The Government submits that neither contested statement is improper. With respect to the subpoena power statement, the Government contends that its reference to the defense's ability to summon witnesses was entirely proper because Mr. Norwood mentioned the absence of Wisconsin client witnesses during his closing argument. It relies on several cases, including *United States v. Miller*, 276 F.3d 370, 374–75 (7th Cir. 2002), in which we held that "as long as it is clear to jurors that the government carries the burden of proof, the prosecutor may tell the jury that a defendant has the power to subpoena witnesses." We have held expressly that such references are permissible when the defendant has remarked on the Government's failure to produce certain witnesses. *See United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016).

---

[24] Tr. at 661–62.

The Government emphasizes that it correctly stated the burden of proof immediately prior to making its statement about Mr. Norwood's subpoena power. It also reminds us that the district court similarly instructed the jury on the correct burden. As for the alleged mischaracterization of evidence, the Government contends that it simply asked the jurors to draw a reasonable inference of Mr. Norwood's intent from the evidence. That sort of inference drawing, the Government submits, is entirely permitted when the record reasonably supports the inference.

The Government is correct. *Miller* and *Flournoy* permit the Government to tell the jury about the defendant's subpoena power, so long as the jury is correctly instructed on the burden of proof. Here, the Government explicitly acknowledged before the jury that Mr. Norwood did not bear any burden of proof, and the district court reiterated the same during final instructions. The Government's reference to Mr. Norwood's subpoena power, moreover, was in response to his argument on the failure to call Wisconsin clients. *See Flournoy*, 842 F.3d at 527–29. Because we see no impropriety in the Government's statement, we need not examine *Darden*'s second prong.

We similarly see no misconduct in the second challenged statement. By arguing that the victim had sex with five men per day because that was what Mr. Norwood intended, the Government simply asked the jury to draw a reasonable inference from the evidence. The statements from Mr. Norwood about "pimping" and the Backpage advertisements for the

victim's services would support reasonably such an inference. Neither statement is improper.[25]

**4.**

Mr. Norwood next asks us to examine a matter involving one of the jurors in his case. Specifically, Mr. Norwood contends that post-trial statements by one of the jurors suggested possible bias or misconduct during deliberations. He submits that the district court erred by denying his motion for a new trial based on the juror issue, and in not conducting further hearings into the matter. We, however, see no error in the district court's decisions with respect to the juror issue.

When the clerk polled the jury, Juror #3 hesitated before confirming that the guilty verdict was her verdict.[26] Once the district court excused the jury, defense counsel made a record of Juror #3's hesitation during the polling. The district court then brought the jury back and repolled each juror. During the second poll, Juror #3 again affirmed her verdict. After this second poll, defense counsel did not seek further action.

The next day, Juror #3 called the district court's chambers and asked to speak to the judge about the verdict. Without

---

[25] Mr. Norwood also brings a cumulative error challenge based on the combination of the (1) admission of the victim's medical records; (2) admission of the recorded jail call; and (3) Government's statements during its rebuttal closing argument. Appellant's Br. 32–33. Because none of these evidentiary decisions and prosecutorial statements were error, there can be no cumulative error.

[26] Defense counsel stated on the record that he saw Juror #3 shake her head before affirming her verdict. Tr. at 719. The district court and Government only noted a hesitation or pause by Juror #3 during the polling process. *Id.* at 720.

returning the call, the district court conferred with counsel and then decided to call Juror #3 back. The call was made from the courtroom, with counsel and Mr. Norwood present. The court informed the parties that it planned to say: "So, you called, and what did you call about?"[27] Defense counsel asked for a more specific inquiry, but the Government objected that such an approach risked improperly intruding on the jury's deliberations.

When asked why she had called, Juror #3 made vague statements about her uneasiness with the guilty verdict that the jury had returned one day earlier. In part, Juror #3 stated:

> I wasn't pleased with what I had said because I didn't really agree with them on that. That's the reason why I was acting hesitant in the courtroom. I haven't spoke to anybody about this case or anything. It's just been on my mind, and I wanted to go with my own opinion. I didn't want to go with them.
>
> …
>
> I had questions, you know; and talking amongst jurors, I didn't get the answers that I needed, and I didn't feel like the verdict that I said was right.[28]

*Id.* at 5–6. Juror #3 then referenced the victim's birth certificate, which was admitted into evidence to establish her age.

---

[27] Mar. 23, 2018 Tr. at 5.

[28] *Id.* at 5–6.

At that point, the district court told Juror #3 that it was going to disconnect the line and call her back in a few minutes.

Once the district court disconnected the line, it sought counsels' views on how to proceed. The Government took the view that no further inquiry was needed because Juror #3 had not "said anything that would allow for a permissible inquiry."[29] Defense counsel contended, however, that further inquiry was needed and again noted Juror #3's hesitation during the first jury poll.

The district court decided to call Juror #3 again to complete the record. When the district court reached Juror #3 the second time, it asked if there was anything Juror #3 would like to add to her earlier statements. Juror #3 told the district court that she "had a lump in [her] throat" during deliberations.[30] She went on to say that she had "a lot of questions [she] wanted answered."[31] Finally, she stated: "I didn't just want to throw a thing out there because everybody else has said it because that's not what I pledged to do. That's why I was so hesitant in the feelings that I had, and I don't like to feel this way."[32]

When Juror #3 finished speaking, the district court asked whether there was anything else she would like to add. Juror #3 responded that there was not. After ending the call, the district court requested that the parties brief the impact of Juror

---

[29] *Id.* at 8.

[30] *Id.* at 13.

[31] *Id.*

[32] *Id.*

#3's call under Federal Rule of Evidence 606 and the Supreme Court's decision in *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017).[33]

Mr. Norwood filed a motion for new trial or, in the alternative, for a further inquiry based on Juror #3's phone call. The Government responded, contending that Juror #3's call did not implicate any exception to the no-impeachment rule in Rule 606(b) and did not implicate *Peña-Rodriguez*'s limited exception to inquire into racial animus during the jury's deliberations. Then, with the district court's permission, each side filed a supplemental brief to address whether *United States v. Daniels*, 803 F.3d 335 (7th Cir. 2015), required the district court to inquire further into Juror #3's reason for calling.

The district court denied Mr. Norwood's motion for new trial based on Juror #3's call, as well as his request for further inquiry. Juror #3, the court explained, did not mention (1) any extraneous prejudicial information brought to the jurors' attention; (2) any outside influences; or (3) a mistake in the verdict form.[34] Nor did Juror #3 mention any other juror's making racial comments or exhibiting racial bias, so *Peña-Rodriguez* did not require a new trial or further inquiry.

Mr. Norwood now contends that the district court erred in denying his new trial motion and in refusing to further question Juror #3. We review a district court's handling of allegations of juror bias or misconduct for abuse of discretion. *See*

---

[33] Mr. Norwood contended that Juror #3's call implicated *Peña-Rodriguez* because both Juror #3 and Mr. Norwood are African American, but the victim is not.

[34] May 9, 2018 Tr. at 18.

*United States v. Farmer*, 717 F.3d 559, 564 (7th Cir. 2013). Federal Rule of Evidence 606(b) generally prohibits a juror from testifying about "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." The rule, however, provides three limited exceptions to that general prohibition. First, when "extraneous prejudicial information was improperly brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A). Second, when "an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2)(B). Third, when there was a mistake entering the verdict on the verdict form. Fed. R. Evid. 606(b)(2)(C).

In addition to Rule 606(b)'s limited exceptions, the Supreme Court has identified an exception to the "no-impeachment rule" when there is evidence of a juror's racial animus during deliberations. *See Peña-Rodriguez*, 137 S. Ct. at 869. There, evidence came to light that a juror in a criminal case had made explicit racist statements during deliberations. The Supreme Court held "that where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way." *Id.* But the Supreme Court clarified that "[f]or the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting *overt* racial bias that cast serious doubt" on the jury's impartiality. *Id.* (emphasis added).

With respect to the district court's obligation to follow up on post-verdict allegations of juror bias or misconduct, *United States v. Daniels*, 803 F.3d at 355, provides the standard. There a jury convicted two defendants on all counts against them.

The district court polled the jury, and each juror affirmed their guilty vote. Later that same day, after the court excused the jurors, a juror visited the court's chambers and told a staff member: "I cannot live with myself knowing what I did. I felt bullied into making the decision that I made." *Id.* at 354. The following weekend, the same juror called the court's chambers and left a voicemail saying: "I wanted to pretty much change my verdict to not guilty because I feel I was bullied and railroaded in the jury deliberation process." *Id.* at 354–55. The defendants asked the district court to question the juror further. We affirmed the district court's denial of that request. We held that the juror's statements did not suggest any permissible basis under Rule 606(b) to interrogate the juror about deliberations. Nor was there any "evidence of outside influence or a threat of physical harm." *Id.* at 355.

Here, all of Mr. Norwood's contentions require substantial speculation beyond Juror #3's post-verdict statements. Mr. Norwood acknowledges that there was no external influence on the jury, but he contends that possible internal pressure tainted the deliberations. Although it is not entirely clear what provision of Rule 606(b) Mr. Norwood relies on, it appears that he believes that *Peña-Rodriguez* required further inquiry because Juror #3 and Mr. Norwood are African American, and the victim is not. Mr. Norwood distinguishes *Daniels* on racial grounds, as well as because the juror in *Daniels* did not display discomfort with the verdict until after the jury was discharged, whereas Juror #3 showed hesitation during the polling process.

The Government submits that none of the three exceptions to Rule 606(b) are present. Juror #3 did not mention

extraneous prejudicial information or outside influence.[35] Addressing Mr. Norwood's *Peña-Rodriguez* arguments, the Government submits that Mr. Norwood is relying entirely on speculation. Juror #3 did not mention race at all.

After full briefing, the district court accepted the Government's position. The district court determined that none of the exceptions to Rule 606(b) were applicable and then noted that Juror #3 did not mention racial animus at all, so *Peña-Rodriguez* did not apply. The district court's determination was certainly not an abuse of its discretion. Juror #3 at most mentioned *internal* pressure, but Rule 606(b)(2)(B) only excepts certain types of *external* pressure from the general no-impeachment rule. *Peña-Rodriguez*, moreover, requires a clear statement of overt racial bias. Juror #3's post-verdict statements did not mention race at all. Moreover, the district court's examination of the problem was thorough. The district court called Juror #3 on the record and gave her three opportunities to say what was on her mind. At the end, the court confirmed that Juror #3 had nothing else to say. There was no need for further inquiry. The district court properly denied Mr. Norwood's motions.

## C.

We now examine Mr. Norwood's contentions with respect to the sentencing hearing. He raises two issues before us: one having to do with the substantive reasonableness of his sentence, the other with an enhancement that the district court applied under the Sentencing Guidelines. The principles guiding our inquiry are well established. We review a district

---

[35] No one argues that there was a mistake in the verdict form.

court's application of the Sentencing Guidelines de novo and its factual findings for clear error. *See United States v. Castro-Alvarado*, 755 F.3d 472, 475 (7th Cir. 2014). When, as here, a defendant challenges a below-guidelines sentence as too high, we review the substantive reasonableness of the sentence for abuse of discretion and presume the sentence is reasonable. *See United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009).

## 1.

We will address Mr. Norwood's substantive reasonableness issue before his guidelines enhancement challenge. During Mr. Norwood's sentencing hearing, the district court calculated the advisory guidelines range of 360 months to life imprisonment, then imposed a sentence of 330 months' imprisonment. The district court also considered the factors listed in 18 U.S.C. § 3553(a). As it went factor by factor through § 3553(a), the district court noted Mr. Norwood's lack of remorse. That lack of remorse, the district court observed, could reasonably mean Mr. Norwood "poses a greater threat of re-offending upon his release."[36]

Mr. Norwood takes issue with the district court's reference to his lack of remorse and failure to accept responsibility during its 18 U.S.C. § 3553(a) analysis. He submits that the district court impermissibly increased his sentence because he refused to disclaim his innocence.

These contentions need to be evaluated in context. Our review of the sentencing record shows that the district court's consideration of the 18 U.S.C. § 3553(a) factors was nothing short of meticulous. Even absent the presumption of

---

[36] Sent. Tr. at 58.

reasonableness granted to the below-guidelines sentence, there is simply no basis to upset the district court's thorough inquiry. The sentencing transcript makes clear that the district court considered Mr. Norwood's lack of remorse in the context of the need for deterrence, not as a free-floating consideration. Section 3553(a)(2) mandates the district court to consider specific deterrence in imposing a sentence. It was reasonable for the district court to conclude that Mr. Norwood's allocution manifested a failure to understand the serious harm that he had inflicted on the victim, thus making him more likely to commit similar offenses after his release. Therefore, we affirm the substantive reasonableness of Mr. Norwood's sentence.

### 2.

We now turn to the final issue in this case. Mr. Norwood challenges the application of the five-level enhancement of § 4B1.5(b) of the Sentencing Guidelines. That enhancement has three elements: (1) that the defendant committed a "covered sex crime"; (2) that neither U.S.S.G. § 4B1.1 nor § 4B1.5(a) applies; and (3) that the defendant engaged in a pattern of activity involving prohibited sexual conduct. Mr. Norwood's challenge centers on the third element, which requires us to consider a pair of terms defined in the Sentencing Guidelines' application notes: "prohibited sexual conduct" and "pattern of activity."

Application note 4 to § 4B1.5 defines "prohibited sexual conduct" to include any offense listed in the "repeat offender" statute, 18 U.S.C. § 2426(b)(1)(A), which in turn includes offenses under Chapter 109A of Title 18 and conduct that would constitute a Chapter 109A offense but for the lack of a jurisdictional hook. A person violates 18 U.S.C. § 2243, which is in

Chapter 109A, when there is a basis for federal jurisdiction and he or she "knowingly engages in a sexual act with another person who (1) has attained the age of 12 years but has not attained the age of 16 years; and (2) is at least four years younger than the person so engaging."

As for "pattern of activity," application note 4 states: "the defendant engaged in a pattern of activity involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." The note then clarifies that the prohibited sexual conduct that forms the pattern of activity does not need to result in a conviction. *See* U.S.S.G. § 4B1.5, cmt. n.4(B)(ii).

Mr. Norwood's challenge to the § 4B1.5(b) enhancement stems both from his misreading of the application note and from his disagreement with the district court's fact finding. He misreads application note 4 in § 4B1.5 to require that he has been convicted of being a repeat offender under 18 U.S.C. § 2426. But § 4B1.5(b) does not require that he be convicted as a repeat offender under § 2426 to qualify for the enhancement. Instead, the enhancement simply incorporates offenses listed in § 2426(b)(1)(A), for which multiple violations would make an individual a repeat offender.

On Mr. Norwood's point about the pattern of activity, the Government contends that the victim's grand jury testimony and statement to the FBI about her multiple sexual encounters with Mr. Norwood are reliable. And the Government submits that the district court made a proper and reasonable factual finding by a preponderance of the evidence that Mr. Norwood had sexual intercourse with the victim on at least two occasions, a violation of 18 U.S.C. § 2243. There is no doubt that 18 U.S.C. § 2243 constitutes prohibited sexual conduct

because it is an offense in Chapter 109A, which § 2426(b)(1)(A) includes.

That takes us to Mr. Norwood's disagreement with the district court's factual finding that he engaged in prohibited sexual conduct with the victim on at least two occasions. Based on our review of the record, the district court reasonably found by a preponderance of the evidence that Mr. Norwood engaged in a pattern of activity involving prohibited sexual conduct with the victim. At sentencing, the district court found that "[t]here is reliable evidence in the record establishing by a preponderance of the evidence that Mr. Norwood had sex with [the victim] at least twice."[37] The district court pointed to the victim's grand jury testimony that she had sexual intercourse with Mr. Norwood when they first met, as well as on other occasions over the following month.[38] The district court also noted Mr. Norwood's statements during the jail call that appear to reference the victim's being "in love with [him]," which the district court found to be an implicit admission of his sexual relationship with her.[39] Finally, the district court noted the medical records containing the

---

[37] *Id.* at 28.

[38] At sentencing, Mr. Norwood objected to the district court's reliance on certain parts of the grand jury testimony, but the district court made explicit findings with respect to the portions it elected to rely upon. In his reply brief, Mr. Norwood also makes a meritless objection based on the Sixth Amendment right to confrontation. *See United States v. Roche*, 415 F.3d 614, 618 (7th Cir. 2005) (noting that "the relevant provision at sentencing is the due process clause, not the confrontation clause," which does not require cross-examination of a declarant).

[39] Sent. Tr. at 28.

victim's statement that she and Mr. Norwood had sex multiple times.

Had there been federal jurisdiction, the conduct found by the district court at sentencing would constitute a violation of 18 U.S.C. § 2243, which therefore makes it prohibited sexual conduct. Moreover, because the district court found that Mr. Norwood had sexual relations with the victim on at least two occasions, it was a pattern of activity of prohibited sexual conduct. *See* U.S.S.G. § 4B1.5, cmt. n.4(B)(ii). The district court pointed to specific evidence that it found reliable and credible. It correctly applied the five-level enhancement of § 4B1.5(b).

## Conclusion

There is sufficient evidence to sustain the conviction. The district court's admission of hospital records did not violate the Confrontation Clause. The district court acted well within its discretion on all other evidentiary questions. The district court correctly applied the United States Sentencing Guidelines and otherwise appropriately exercised its discretion in sentencing Mr. Norwood. Accordingly, the judgment of the district court is affirmed.

AFFIRMED