In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 19-2209 & 19-3408

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT NIETO and DARRICK R. VALLODOLID,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:15-cr-00072 — **Philip P. Simon**, *Judge.*

———————————

ARGUED SEPTEMBER 13, 2021 — DECIDED MARCH 28, 2022

———————————

Before RIPPLE, ROVNER, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Robert Nieto and Darrick Vallodolid once led chapters of the Latin Kings gang in northwest Indiana. Both received life sentences following a jury trial resulting in convictions for violating federal racketeering and narcotics laws, with the jury also finding that Nieto and Vallodolid participated in murders to further the gang's activities. Nieto and Vallodolid raise a host of issues on appeal, ranging from a contention that the prosecution committed a

*Batson* violation by striking two prospective Hispanic jurors from the venire, to challenges to the sufficiency of the evidence and to aspects of their sentencing. We see no errors and affirm.

**I**

A federal investigation of the Latin Kings in Chicago and northwest Indiana uncovered evidence of the gang's widespread drug trafficking and violence, including several murders. In time a grand jury charged multiple members with participating in racketeering and narcotics conspiracies from 2003 through 2017. Of the many individuals indicted, most pled guilty. The two defendants before us on appeal, Nieto and Vallodolid, chose to go to trial in May 2018.

The jury heard considerable evidence about the Latin Kings' organizational structure at the national, regional, and local levels. Suffice it to say that the gang organized itself like a corporation, with roles and responsibilities assigned to various members—all to further the gang's unity of purpose, including its lucrative and expansive drug trafficking activities.

The trial evidence showed that Nieto and Vallodolid held leadership positions in the northwest Indiana chapters of the Latin Kings. Nieto joined the Kings in 1986 and founded the gang's chapter in Gary. For several years, he served as "Inca," the chapter's highest leadership role. After a period of incarceration from 2001 to 2007, Nieto returned to holding leadership positions through at least 2013. At one point, he served as the King's regional Enforcer—a position, as its name implies, in which Nieto enlisted other members to impose discipline on Kings who stepped out of line by violating one or another of the gang's rules. For his part, Vallodolid belonged

to the 148th Street Indiana Latin Kings chapter from 2008 until at least 2012. Like Nieto, Vallodolid held various leadership positions, including for a time as Inca in the chapter in Hammond.

The trial also focused on the Latin Kings' drug business in northwest Indiana. For now all we need to say is that the business was substantial, profitable, and conducted with sophistication and persistence. The Kings had a stable stream of reliable suppliers of large quantities of marijuana and cocaine. At other times, the gang would acquire drugs by robbing rivals on the streets. The evidence showed that Nieto and Vallodolid were meaningful and active players in the gang's drug trade.

The government also presented evidence of the violence that accompanied the affairs of the Latin Kings. By way of example, witnesses testified that initiation into the Kings brought with it violence, with new members having to endure beatings. Harsh physical discipline also befell a King who violated the gang's rules or made a costly mistake like losing a gun. Gang members further testified that individual chapters would respond to interference by or unwanted competition from rival gangs with targeted shootings or other acts of violence.

The trial focused on two specific murders—one from 2009 and another from 2013:

*The 2009 murder of Victor Lusinski.* While riding his bicycle along a Hammond alleyway in the spring of 2009, 16-year-old Victor Lusinski was shot in the head at point-blank range with a .22-caliber gun. The physical evidence recovered by the police was thin, but witnesses, including many Kings, testified that Vallodolid had bragged about his role in the murder.

Keith Manuel, for example, testified that he heard Vallodolid, a fellow King, boast about using a .22-caliber revolver to shoot a kid on a bike that he believed was a member of a rival gang. Manuel recalled Vallodolid saying that he "took care" of gang business.

*The 2013 murder of Rolando Correa.* On December 2, 2013, a group of five men—including Nieto and at least one other man affiliated with the Latin Kings—planned and executed a drug robbery at the home of Anthony Martinez, who they suspected had ties to a rival organization. The jury learned that on the night of the robbery, Nieto stayed home and played the role of a lookout by listening to a police scanner while four others forced their way into Martinez's home to steal a drug stash. A fight ensued and ended with Rolando Correa, a neighbor who had gone to Martinez's house to deter the robbers, being shot and killed. After the murder, Nieto admitted to his role in the robbery and told investigators that he knew the hit had "something to do with gang bang" to protect Latin King territory from a rival competitor.

After an 11-day trial, a jury convicted Nieto and Vallodolid on both the RICO (18 U.S.C. § 1962(d)) and drug conspiracy (21 U.S.C. § 846) counts. In returning this verdict, the jury made four special findings—that Vallodolid participated in the 2009 murder of Victor Lusinski, that Nieto played a role in the 2013 murder of Rolando Correa, and that each defendant was responsible for distributing more than five kilograms of cocaine and 100 kilograms of marijuana. In the end, and relying on the jury's special findings, the district court sentenced both Nieto and Vallodolid to life—the maximum penalty available under 18 U.S.C. § 1963(a).

Nieto and Vallodolid now appeal their convictions and sentences.

## II

### A

We begin with Nieto's and Vallodolid's challenge to the district court's denial of their *Batson* motion. They claim the government violated the equal protection-based rule announced in *Batson v. Kentucky*, 476 U.S. 79, 85–86 (1986), including its inherent fair cross-section requirement, by exercising peremptory strikes to remove nearly all Hispanic members from the venire.

Here is what happened during jury selection: Both defendants are Hispanic, and the venire included five Hispanics. One of those five (Ms. Mariscal) ultimately sat as a juror. The government used peremptory strikes against three of the others—Mr. Acosta, Ms. Gonzalez, and Mr. Garcia. Nieto and Vallodolid objected, claiming that the government struck Ms. Gonzalez and Mr. Garcia based on their ethnicity. The prosecutors disagreed, explaining that their strikes reflected the "disdain" and "distaste and dismay" Ms. Gonzalez and Mr. Garcia expressed for the government during jury selection.

As to Ms. Gonzalez, the government stated that the disapproval she expressed of the government's immigration policies could affect her impartiality. What concerned the government was Ms. Gonzalez confirming her own "preconceived attitudes about the American legal system and the courts or lawyers," including that she was upset with many government actions taken as to "immigration, mental health … knowing that I have family or relatives that may have gone through certain things." The government explained that even

though Ms. Gonzalez swore she could set aside those views, it struck her from the venire out of concern that her displeasure with national immigration policy could spill over and prejudice her or the broader jury against the United States and its prosecutors.

The government voiced a similar concern with Mr. Garcia. It noted that he had expressed contempt for police and courts by saying that "the justice system is flawed and biased against people who don't have means." Even more, the government continued, Mr. Garcia admitted that he had preconceived notions about the criminal justice system but "suppose[d]" he could listen to the evidence of the case and decide the case based on the law. The prosecutors heard these answers as indicative of an anti-government bias and therefore exercised a peremptory strike against Mr. Garcia.

In assessing Nieto's and Vallodolid's objections, the district court employed the familiar three-step framework from in *Batson* and its progeny. See *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003) (citing *Batson*, 476 U.S. at 96–98). At step one, the defendant must present a prima facie case that ethnicity motivated the peremptory strike in question. At step two, the government must respond with an ethnicity-neutral reason for the strike. If the government does so, step three requires the court to determine whether the defendant has carried the burden of showing that the government engaged in purposeful discrimination. See *id.*

Applying this framework, the district court found the government's ethnicity-neutral justifications as "entirely believable and acceptable" and therefore rejected Nieto and Vallodolid's *Batson* challenge.

B

We see no error in the findings underpinning the district court's *Batson* ruling. See *United States v. Cruse*, 805 F.3d 795, 806 (7th Cir. 2015) ("We review the district court's *Batson* findings for clear error.").

Because the government offered neutral justifications for the challenged strikes, the *Batson* step-one question whether Nieto and Vallodolid presented a prima facie case of impermissible discrimination is moot. See *Hernandez v. New York*, 500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

Turning to *Batson*'s second prong, Nieto and Vallodolid argue that the government's proffered reason for striking Ms. Gonzalez—because her disagreement with U.S. immigration policy reflected anti-government bias—was not neutral. They claim that because Ms. Gonzalez's views on immigration were the product of her experience as a Hispanic woman, the government's justification necessarily rooted itself in her ethnicity. We are not persuaded.

The district court committed no clear error in finding that the government's reason for striking Ms. Gonzalez was not "expressly predicated on her ethnicity." Rather, the government struck Ms. Gonzalez because of its concern that her disagreement with U.S. immigration policy would result in bias against the government at trial. And so, too, did the district court reasonably conclude that the government would have struck a non-Hispanic prospective juror that expressed the

same policy views. Disagreeing with U.S. immigration policy, in short, is not dependent on ethnicity.

We reach the same conclusion when considering the government's strike of Mr. Garcia. When asked if he had views of the criminal justice system, he said yes, explaining that he saw the system as biased against people of lesser means. Nothing about that explanation, the district court rightly concluded, rooted itself exclusively in Mr. Garcia's Hispanic heritage.

Moving to *Batson*'s third step, we see no error there either. In attempting to show purposeful discrimination, Nieto and Vallodolid contended that (1) the government's peremptory strikes removed 60% of the prospective Hispanic jurors but only 11% of the prospective non-Hispanic jurors, (2) its justifications disparately impacted Hispanic individuals, and (3) it did not use peremptory strikes on similarly situated non-Hispanic individuals. The district court reasonably found that each contention fell short.

Although the government struck a greater proportion of Hispanic than non-Hispanic prospective jurors, the statistical disparity alone is not enough in these circumstances to show purposeful discrimination at *Batson*'s third step. Our prior cases have cautioned against finding intentional discrimination from statistical analysis rooted in a small data set. See, *e.g.*, *Bennett v. Gaetz*, 592 F.3d 786, 791 (7th Cir. 2010) (determining that although the government struck two of five African American prospective jurors, "the relatively small numbers of African American prospective jurors and peremptory challenges" made it difficult to draw any inferences of discrimination). Striking only three of five Hispanic jurors here—a small number to begin with—similarly makes it "difficult to draw significance from th[e] disparity." *Id.* The district court

committed no error in declining at step three to find purposeful discrimination from the statistical disparity urged by the defendants. Compare *Miller-El*, 537 U.S. at 342 (holding that the government's exclusion of 10 out of 14, or 91%, of Black prospective jurors—along with the state's unreliable justifications—showed purposeful discrimination).

We also reject Nieto's and Vallodolid's argument that the disparate effect of the government's peremptory strikes on prospective Hispanic jurors shows purposeful discrimination. Nobody questions that Ms. Gonzalez's experience as a Hispanic woman influenced her views on immigration policy, at least at some level. And perhaps Mr. Garcia's experience as a Hispanic man affected his views toward the criminal justice system. At step three of the *Batson* inquiry, however, the Supreme Court has observed that disparate impact alone cannot be enough to show intentional government discrimination. See *Hernandez*, 500 U.S. at 361 (explaining that "disproportionate impact does not turn the prosecutor's actions into a *per se* violation of the Equal Protection Clause"). The district court's acceptance of the government's ethnicity-neutral explanation resulted in a finding of no intentional discrimination. We see no clear error in the district court's factual analysis.

Finally, Nieto and Vallodolid more generally insist that the government engaged in discrimination by not exercising peremptory strikes against non-Hispanic members who had expressed anti-government bias during jury selection. The premise does not hold: the voir dire transcript shows many prospective jurors discussing their experiences with the criminal justice system, but we see not a single instance of a non-Hispanic individual expressing anti-government bias—at

least not to any degree close to what the district court heard from Ms. Gonzalez and Mr. Garcia. Like the district court, we do not see differential treatment between Hispanic and other members of the venire.

In all, the district court took great care in handling and resolving the defendants' *Batson* challenge. The court applied the correct legal standards, reasonably accepted the government's ethnicity-neutral justifications, and adequately supported its finding of no intentional government discrimination. We will not upset the district court's ruling.

## III

We turn next to Nieto's and Vallodolid's challenges to the sufficiency of the trial evidence. Our review is highly deferential, as the law affords great respect to a jury's weighing and assessment of the evidence. See *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). "[W]e review the evidence in the light most favorable to the Government and will overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could have found guilt beyond a reasonable doubt." *United States v. Norwood*, 982 F.3d 1032, 1039 (7th Cir. 2020).

And where, as here with Nieto, a defendant invokes Federal Rule of Criminal Procedure 29 and moves for a judgment of acquittal at the close of the government's case but fails to renew that motion following an adverse verdict at the end of the trial, we extend even greater deference to the jury's ultimate determination of guilt. See *id.* In these circumstances, we will upset the jury's verdict only upon Nieto showing that leaving the conviction in place would amount to a "manifest miscarriage of justice." *Id.*

A

We begin with Vallodolid's challenge to the sufficiency of the evidence for his involvement in the 2009 murder of Victor Lusinski.

Vallodolid first challenges various witness testimony. For starters, he claims the testimony of co-conspirators, including Josh Roberts and Keith Manuel, was too unreliable to sustain a conviction for murder. The jury could have found otherwise, though.

Josh Roberts testified that on the day of the Lusinski murder, Vallodolid called him to ask for help disassembling a .22-caliber revolver—the same type of weapon used to kill Lusinski. Keith Manuel corroborated Roberts's account by explaining that Vallodolid told him he had shot a kid and then took the gun to Roberts's house afterward. Roberts also testified, as did other gang members, that Vallodolid had bragged to him about shooting a kid on a bike who wore his hat in the style of a rival gang. After the murder, Vallodolid even began referring to himself as "deuce"—an apparent reference to the weapon (the .22) used to shoot Lusinski.

Vallodolid further claims the testimony of eyewitnesses to the Lusinski murder proves he could not have been the killer. On the day of the Lusinski murder, Vallodolid underscores, four eyewitnesses to the shooting—all 10- or 11-year-old boys—reported that the shooter was Black. Vallodolid sees this testimony as exonerating because he has light skin.

But Vallodolid fails to account for the evidence that called into question the accuracy of the eyewitnesses' accounts. The witnesses saw the shooting from across the street—a point they acknowledged in their trial testimony. Even more, the

witnesses confused other important details, including the direction from which the shooter came and later escaped to, how many people were with the shooter, whether Lusinski was on a bicycle, and the distance from which the shooter killed Lusinski.

In short, the district court reasonably observed that the eyewitness testimony "was riddled with inconsistencies, and [the jury] was entitled to either credit or discredit it." And unless a witness provides testimony that would have been physically impossible for them to see or "impossible under the laws of nature"—which did not happen here—the jury makes the ultimate credibility determinations. See *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996). On this record, we owe respect to the jury's credibility determinations.

Vallodolid argues that the lack of physical and forensic evidence tying him to the crime also helps establish his insufficiency claim. But the law is clear that a circumstantial case can be enough. See *United States v. Garcia*, 754 F.3d 460, 470 (7th Cir. 2014); *United States v. Ray*, 238 F.3d 828, 833–34 (7th Cir. 2001). And considered altogether, the record provided a sufficient basis for the jury to conclude that Vallodolid murdered Lusinski to help defend Latin King territory.

B

That brings us to Nieto's challenge to his conviction for the 2013 murder of Rolando Correa. We conclude here, too, that a rational jury could have found beyond a reasonable doubt that Nieto shouldered responsibility for Correa's murder.

Nieto does not contest the jury's finding that he participated in the offense. He instead claims that the evidence did not show that the robbery and murder bore any connection to

the affairs of the alleged RICO enterprise, the Gary, Indiana Latin Kings. Indeed, Nieto contends that the evidence demonstrated that he was no longer even affiliated with the Kings at the time of the Correa robbery and murder. And of the four men who committed the robbery, he adds, only Bruce Hendry was a Latin King. The other two participants, Nieto urges, were unaffiliated with the gang. On this score, Nieto points to the testimony of Mark Cherry, a member of the Black P. Stones gang, who told the jury that the Correa robbery had no connection to the Latin Kings.

But our review shows that the evidence was not that one-sided. To the contrary, the government presented ample proof that the robbery and Correa murder related to and furthered the activities of the northwest Indiana Latin Kings. Perhaps most damaging to Nieto's contention is a statement he made to the FBI following the murder: he admitted that he and others planned the robbery at Martinez's house to protect Latin King territory from a rival gang, the Latin Dragons. To put the point in Nieto's own words, he believed the robbery "was something to do with a gang bang" because "[t]here was a Dragon moved in the hood."

The jury also heard testimony that Nieto, while leading the Kings' Gary chapter, had arranged drug-related robberies. This testimony, combined with the other evidence, was enough for the jury to find that Nieto planned and participated in both the robbery and Correa murder. When he learned that Martinez's house was full of marijuana, Nieto called fellow gang member Bruce Hendry to help execute a robbery, just as Kings had done in the past. The duo then enlisted Mark Cherry's help with the job. To be sure, Cherry testified that he was a member of the Stones gang, not the Latin

Kings. But the jury was entitled to credit evidence that the Latin Kings and the Stones were both part of an alliance of gangs called the People Nation and thus that the robbery and murder furthered the activities of the Kings, at least to some extent.

We see no merit to Nieto's contention that the district court improperly admitted certain testimonial evidence relating to the robbery and Correa murder. He argues, for example, that the district court should have excluded Mark Cherry's testimony because it was conditional co-conspirator evidence unsupported by the record. See *United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016) (allowing the government to present co-conspirator statements so long as there is sufficient evidence showing a conspiracy, that the defendant and the declarant were part of the conspiracy, and that the proffered statement was made in furtherance of the conspiracy).

We see the evidence another way, however. In the testimony at issue, Cherry told the jury about a conversation he had with Nieto and Hendry leading up to the robbery and murder. He testified that just before the December 2 robbery, Nieto and Hendry planned the job, including by discussing how much money and marijuana to expect in Martinez's house. There was no abuse of discretion in admitting Cherry's testimony. That evidence, and, in the end, the remainder of the trial evidence was sufficient to support Cherry's testimony and the jury could rely on it in reaching its special verdict as to the Correa murder.

Nor do we see any error in the district court's admission of Arturo Lizardi's testimony. Lizardi told the jury that on the day of the robbery, Martinez had told him and Nieto's stepson, Erik Brink, that there was a lot of marijuana in his house.

The government used that testimony to show that Nieto learned about Martinez's marijuana stash from his stepson and from there planned the robbery. The district court admitted Martinez's statement not for its truth, but for its effect on Brink—to show that Brink had reason to believe Martinez had a sizeable marijuana stash.

On the stand, Lizardi testified that Brink stood only a few feet away from him when Martinez referenced the amount of marijuana in his house, and that he believed Brink had been listening. The testimony that Brink was nearby and listening allowed a finding that the statement, regardless of its truth, had an effect on Brink. And Nieto did nothing to impeach this testimony. In these circumstances, we see no abuse of discretion in the admission of Lizardi's testimony. This testimony only added to the basis on which the jury could have concluded the Martinez robbery and Correa murder were connected to the affairs of the Latin Kings.

All of this evidence, considered collectively, supported the jury's special finding that Nieto participated in the drug robbery and the related murder of Mr. Correa to further the affairs of the Latin Kings.

## C

We likewise reject Nieto and Vallodolid's challenge to the sufficiency of the evidence supporting the drug conspiracy conviction under 21 U.S.C. § 846.

To prove the alleged conspiracy, the government had to show that two or more people agreed to distribute narcotics and that the defendant in question knowingly and intentionally joined in the agreement. See *United States v. Maldonado*, 893 F.3d 480, 484 (7th Cir. 2018). It is also essential that the

government prove the existence of a distinct agreement to distribute drugs and not just mere buying and selling. See *id.*

Nieto and Vallodolid posit that the government's circumstantial evidence fell short because "it cannot be said that the members acted in concert to further each other's drug distribution effort." The record shows otherwise.

As for the existence of an agreement to distribute cocaine and marijuana, we start with the observation that Nieto and Vallodolid were members and leaders of Latin Kings chapters. That fact alone makes conspiracy more likely. See *United States v. Alviar*, 573 F.3d 526, 537 (7th Cir. 2009) ("The fact that [the defendants] were bound together by their gang membership made it more likely that they participated in a conspiracy."). But the government also presented more specific evidence—most of which came from Nieto's and Vallodolid's fellow gang members—showing the Latin Kings, including both defendants here, profited from drug distribution.

For example, Indiana Latin King Alexander Vargas testified that for almost a decade he received substantial amounts of cocaine—up to a half a kilogram a week—from gang superiors that he would then sell or front to other Latin Kings in Indiana. He also explained that sometimes drugs were given to King chapters to help with gang fundraising and that he sold drugs so that his local chapter could "keep up" financially with rivals. The practice of sending drugs down the chain of command to benefit the organization, Vargas explained, was commonplace for the Kings.

Several other witnesses, including Latin Kings members, similarly described how individual members or regions of the gang would receive substantial quantities of drugs from

superiors to then sell or front to other members. Keith Manuel, for instance, testified that one leader, Hector Pelon, provided Latin Kings, including Vallodolid, with cocaine and marijuana once or twice a week for many years. All this evidence, we think, could lead a reasonable jury to find that the Latin Kings had a common goal of distributing narcotics for the benefit of the organization.

Next, we look to the second prong of the statute and assess whether the jury could have properly concluded that Nieto and Vallodolid knowingly participated in the conspiracy. Here too we have no doubt a rational jury could have found as much.

The government presented evidence that Nieto received drugs through a chain of Latin King leaders. On this score, consider the testimony of Alexander Vargas. He testified to selling drugs to another Latin King who, in turn, sold to Nieto. And the jury also heard the testimony of several witnesses who stated that, more than once, they had purchased drugs from Nieto and had seen him sell to others. Jason Brown, for example, told the jury that as a Latin King, he regularly bought marijuana from Nieto and saw him "move[ ] pounds" of drugs at a time. Another Latin King, Raphael Cancel, testified that he got "maybe about a half—maybe a kilo" of cocaine from Nieto and that he had seen him in possession of significant weights of the drug. And former Latin King Jose Sanchez offered similar testimony. And Joshua Roberts—yet another Latin King—testified that Nieto often gave him and other Kings cocaine over the course of five years.

All of this evidence was enough to lead a reasonable juror to the conclusion that Nieto's drug business was, in fact, part of the larger Latin Kings' drug distribution conspiracy.

Likewise with Vallodolid. For his part, Keith Manuel testified (like several other witnesses) that he saw Vallodolid sell at least four kilograms of cocaine that he received from Latin Kings leader, Hector Pelon. Joshua Roberts similarly testified that Vallodolid "was getting [marijuana] from another Latin King" to, in turn, provide to other members. Even Vallodolid himself admitted that he "purchased drugs from an ILK [Indiana Latin King] and sold drugs to other ILKs." Based on the evidence of receiving drugs from gang members and selling to both Kings and non-Kings, a reasonable juror could have concluded Vallodolid, like Nieto, played a role in the drug distribution chain of the Latin Kings organization.

Much of the same evidence supports the jury's determination that, over the lifetime of the decade-long conspiracy, Nieto and Vallodolid were responsible for the requisite amount of drugs to justify an increased sentence. Recall that the jury determined that both Nieto and Vallodolid were guilty of participating in a RICO conspiracy, in violation of 18 U.S.C. § 1962(d). The provision ordinarily carries a maximum sentence of twenty years. See 18 U.S.C. § 1963(a). But Congress created an exception to that maximum where "the violation [of § 1962(d)] is based on a racketeering activity for which the maximum penalty includes life imprisonment." *Id.* That is what happened here.

Under § 1963(a), the jury could (and did) find each defendant was eligible for a life sentence if each defendant conspired to distribute or possess with intent to distribute at least 5 kilograms of cocaine or 100 kilograms of marijuana—an offense that qualifies as "racketeering activity" (see 18 U.S.C. § 1961(1)(D)) and that is itself eligible for a life sentence (see 21 U.S.C. § 841(b)(1)(A)).

We begin with Nieto. Again, several witnesses testified that they regularly purchased drugs from Nieto for individual use. But beyond those frequent but small amounts, witnesses like Jose Sanchez and Raphael Cancel testified that Nieto sold four or five ounces of cocaine a week during a two-year period and that he sold at least one individual up to a full kilogram of cocaine. Assuming the jury believed all that to be true, those amounts would have totaled more than thirteen kilograms—much more than the requisite five kilograms.

Even more, there was sufficient evidence for jury to conclude that Nieto was responsible for distributing five kilograms of cocaine because of the reasonably foreseeable amounts in the transactions of co-conspirators. See *United States v. McLee*, 436 F.3d 751, 765 (7th Cir. 2006). Nieto was a major participant and leader in the Indiana Latin Kings—an organization that profited from a large drug distribution conspiracy. Witnesses' testimony confirmed that Latin King peers of Nieto sold at least a combined 12 kilograms in just one year. Consequently, it would not have been irrational for the jury to find that Nieto was responsible for at least five kilograms of cocaine through either his own possession or the reasonably foreseeable distribution of his co-conspirators.

As to Vallodolid, the government presented similarly strong testimonial evidence. Keith Manuel, for one, testified that he saw Vallodolid buy "four bricks" over the course of two years. And he was not the only Latin King to testify as to quantities: Jose Sanchez told the jury he bought at least a gram and a half of cocaine from Vallodolid, while Raphael Cancel testified Vallodolid sold him cocaine 20 or 25 times, giving him approximately three grams of cocaine each time. Plus, the jury again could consider the evidence of Vallodolid's peers'

drug distribution. In all, a reasonable jury could have concluded that Vallodolid too was responsible for distributing at least five kilograms of cocaine.

We affirm Nieto and Vallodolid's drug conspiracy convictions.

## IV

We come, then, to Nieto's and Vallodolid's sentencing challenge. They contend that the district court lacked the legal authority under the applicable provision of RICO, 18 U.S.C. § 1963, to impose a life sentence without first complying with certain procedural requirements imposed by state law. Their position requires some unpacking.

Remember that the jury, in returning guilty verdicts against both defendants, made special findings pursuant to 18 U.S.C. § 1963(a) that increased Nieto's and Vallodolid's maximum sentence to life. In addition to finding that the defendants distributed a sufficient quantity of drugs to justify a life sentence under federal law, the jury also found each played a role in a murder to further the activities of the Latin Kings—a crime also punishable by life in prison under Indiana law. See Ind. Code § 35-50-2-9(b)(1)(I). Even more specifically, the jury found that Nieto served as lookout during the robbery that led to the murder of Rolando Correa and that Vallodolid shot and killed 16-year-old Victor Lusinski. These express findings—by operation of § 1963(a)—allowed the district court to increase both defendants' punishment to life imprisonment.

Both defendants challenge the sentencing enhancement based on the special verdicts for murder. Under Indiana law, Nieto and Vallodolid observe, a defendant must be given a separate proceeding before receiving a life sentence for

murder. See Ind. Code § 35-50-2-9(d) ("If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing."). The purpose of the separate proceeding is to allow the jury to consider mitigating circumstances and, in the end, to determine whether the government has carried its evidentiary burden of showing that the murder in question involved aggravating circumstances—here, that the murders furthered the affairs of the Latin Kings. See *id.* The district court did not hold a separate hearing before imposing the life sentences, an error both defendants contend renders their life sentences procedurally invalid under Indiana law and, by extension, under § 1963(a).

It is the last link in the chain—the extension from Indiana law to RICO—where the defendants falter in their reasoning. Put simply, the defendants misinterpret the requirements and operation of § 1963(a). No doubt Congress incorporated certain state offenses—those "for which the maximum penalty includes life imprisonment"—into RICO. 18 U.S.C. § 1963(a). But substantive incorporation and procedural incorporation are not one and the same. We made this observation in *United States v. Muskovsky*, explaining that the enhancement in § 1963(a) is not concerned with state procedures—like additional hearings—but focuses on what constitutes a crime under state law. See 863 F.2d 1319, 1330–31 (7th Cir. 1988). Federal law supplies the procedures that district courts must follow in imposing federal sentences.

All other circuits to have considered the question have reached the same conclusion. See, *e.g.*, *United States v. Paone*, 782 F.2d 386, 393 (2d Cir. 1986) ("Congress did not intend to incorporate the various states' procedural and evidentiary rules into the RICO statute. The statute is meant to define, in

a more generic sense, the wrongful conduct that constitutes the predicates for a federal racketeering charge."); *United States v. Licavoli*, 725 F.2d 1040, 1046 (6th Cir. 1984) ("The reference to state law in the statute is simply to define the wrongful conduct, and is not meant to incorporate state procedural law."); *United States v. Frumento*, 563 F.2d 1083, 1087 (3d Cir. 1977) (specifying that RICO's "reference to state law is necessary only to identify the type of unlawful activity in which the defendant intended to engage").

Because the jury found beyond a reasonable doubt that each defendant committed murder (as defined under Indiana law), while also committing criminal organizational activity, the district court properly incorporated the substance of the predicate offense. No bifurcated proceeding was necessary. Consequently, the district court committed no legal error, substantive or procedural, in imposing life sentences on Nieto and Vallodolid.

## V

Nieto and Vallodolid raise a host of other issues. For example, they claim the evidence presented against them—including testimony of Latin Kings members and evidence of the gang's violent acts—was unnecessary, cumulative, and shocking and that the district court impermissibly allowed the testimony of several witnesses. Having carefully reviewed the record, we find no merit in these additional contentions.

Both Nieto and Vallodolid were well represented on appeal but because there are no errors, we are left to AFFIRM.