In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――――――

No. 20-2938

DANIEL M. WILSON,

*Petitioner-Appellant,*

*v.*

GARY A. BOUGHTON,

*Respondent-Appellee.*

―――――――――――

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:19-cv-1016 — **William C. Griesbach**, *Judge.*

―――――――――――

ARGUED MAY 18, 2022 — DECIDED JULY 19, 2022

―――――――――――

Before SYKES, *Chief Judge*, and HAMILTON and KIRSCH, *Circuit Judges*.

KIRSCH, *Circuit Judge*. A Wisconsin jury convicted Daniel Wilson of sexually assaulting his girlfriend's young daughter, and the Wisconsin appellate courts affirmed. Wilson unsuccessfully sought habeas relief in federal district court and now appeals to us, arguing that the evidence could not support his conviction and that his counsel's representation was

constitutionally deficient. But the Wisconsin courts reasonably found neither to be true, so we affirm.

I

In June 2013, Daniel "Trey" Wilson rekindled a romantic relationship with Jeanette Yegger, with whom he shares a child named Anthony. Yegger had four other children not fathered by Wilson; the oldest was FT, who, at that time, was seven years old and had special needs. At the outset of the rekindled relationship, Yegger was living with her five children and mother on Buffum Street in Milwaukee, and Wilson stayed there only occasionally. But those living arrangements changed in November 2013 when the couple moved with Yegger's five children into a house on 6th Street.

Within months of the move, the Bureau of Milwaukee Child Welfare received reports of physical abuse and unexplained injuries on Yegger's children. It therefore placed Yegger on a protective plan in May 2014, which required a protective adult to supervise Yegger's continued custody of her children. Originally, Yegger's sister acted as that adult at the 6th Street house from May 5 to May 13. But that did not work out, so Wilson's mother, Armer Lloyd—whom FT called "Anthony's granny"—agreed to take over, and the family moved to Lloyd's house on 28th Street on May 13, 2014.

One week later, on May 20, the Bureau removed all five children from Yegger's custody for placement with foster families. Each child received a medical checkup at the Children's Hospital of Wisconsin's Child Protection Center; FT's checkup was with pediatric nurse practitioner Debra Bretl. During the checkup, Bretl observed five genital lesions on FT. As Bretl made that observation, FT cried in response:

"Someone did this to me," and, presumably referring to the instrument Bretl used during the exam, "Take it out."

FT had a follow-up appointment with pediatrician Judy Guinn three days later. Dr. Guinn observed genital and anal lesions, and an antibody test later allowed her to diagnose them as herpes.

Five days later, on May 28, FT spoke with Amanda Didier, a forensic interviewer at the Hospital's Child Protection Center, in a recorded video interview. FT recounted eight times that she had been sexually assaulted by Wilson, and police arrested Wilson later that day.

The State charged Wilson with Engaging in Repeated Acts of Sexual Assault of the Same Child in violation of Wis. Stat. § 948.025. One element of that offense requires at least three qualifying acts to occur "within a specified period of time." *Id.* § 948.025(1). The State specified this period as January 1, 2013 through May 5, 2014.

During the three-day jury trial on this charge, FT, Wilson, Yegger, Didier, and Guinn, among others, testified. The judge instructed the jury that it could find Wilson guilty of the lesser-included offense of First-Degree Sexual Assault of a Child, Wis. Stat. § 948.02(b), which requires only a single qualifying act, instead of the greater charged offense, which requires three. But the jury found Wilson guilty of the greater offense, § 948.025(1).

At sentencing, Wilson maintained his innocence to which the judge, who also presided at trial, responded, "[T]here was based upon my hearing of the case overwhelming testimony that you committed these outrageous assaults against that

little girl." The judge then sentenced Wilson to 37 years' imprisonment with 13 years of extended supervision.

In a post-conviction motion, Wilson argued that the evidence could not support his conviction and that his counsel's performance was constitutionally deficient. The trial court denied his motion, the Wisconsin Court of Appeals affirmed, and the Wisconsin Supreme Court denied Wilson's subsequent petition for review.

Wilson then filed a habeas petition challenging his conviction, again arguing that the evidence was insufficient and his counsel's performance inadequate. The district court denied the petition but issued a certificate of appealability for each claim, and Wilson appealed.

II

We start with Wilson's sufficiency-of-the-evidence challenge. See *Jackson v. Virginia*, 443 U.S. 307 (1979). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we can grant habeas relief only under a few, limited circumstances. See 28 U.S.C. § 2254(d). Wilson argues that one such circumstance applies here. In his view, the Wisconsin Court of Appeals reached its decision to reject his sufficiency-of-the-evidence challenge "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).

But Wilson has invoked the wrong AEDPA provision on appeal. The Wisconsin Court of Appeals did not purport to make any factual determinations in affirming his conviction. See *Lopez v. Smith*, 574 U.S. 1, 8 (2014) (per curiam) (holding that a court's determination on whether a set of facts "measure[d] up to the [applicable legal] standard …. ranked as a

legal determination governed by § 2254(d)(1), not one of fact governed by § 2254(d)(2)"). Instead, it merely cited the record to reach its legal conclusion that the jury had enough evidentiary support to find Wilson guilty of the charged offense under *Jackson v. Virginia*. We thus address his challenge under § 2254(d)(1) rather than (d)(2). Under this provision, we can grant habeas relief only if Wilson's state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

To succeed, "a petitioner must persuade a federal court that no fairminded jurist could reach the state court's conclusion" under Supreme Court precedents. *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (citation omitted and cleaned up). "The question under AEDPA is thus not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable—a substantially higher threshold for a prisoner to meet." *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022) (citation omitted).

Under *Jackson v. Virginia*, the relevant Supreme Court precedent, evidence is constitutionally sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. This standard requires courts to presume that the trier of fact resolved any conflicting inferences in the prosecution's favor and to "defer to that resolution." *Id.* at 326. Given these two layers of deference under AEDPA and *Jackson*, habeas petitioners pressing *Jackson*-based claims "face a high bar." *Coleman v. Johnson*, 566 U.S. 650, 655–56 (2012) (per curiam).

The charge for which Wilson was convicted requires three acts of "sexual intercourse with a person who has not attained the age of 12 years." Wis. Stat. §§ 948.025(1)(b); 948.02(1)(b). The Wisconsin Court of Appeals held the evidence sufficient to convict Wilson because the jury heard FT describe at least three qualifying acts of sexual assault "at the homes where the family had lived during the specified time frame." Wilson argues that this explanation unreasonably construed the trial record which resulted in an unreasonable application of *Jackson v. Virginia*. According to Wilson, FT testified that all but one of the qualifying acts occurred when the family lived with Wilson's mother from May 13–20, 2014, a period *after* the State's specified timeframe ended on May 5.

We do not find the Wisconsin Court of Appeals' explanation unreasonable. It's true that, at trial, FT clearly testified about only one act that neatly fits Wisconsin's definition of "sexual intercourse"[1] during the State's specified period. She testified that Wilson "touched [her] behind with his mouth" after pulling her pants down when she was asleep "at my house," not "Anthony's granny's house." All agree that "my house" refers to the 6th Street house, in which the family lived until May 13, 2014. Although it's possible that this assault occurred during the eight days after the State's specified period ended (May 5) but before the family's move from the 6th Street house (May 13), we do not understand Wilson to

---

[1] "[S]exual intercourse" is defined to mean: "vulvar penetration as well as cunnilingus, fellatio or anal intercourse between persons or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening either by the defendant or upon the defendant's instruction. The emission of semen is not required." Wis. Stat. § 948.01(6).

challenge the sufficiency of the evidence for this one act. At oral argument, Wilson's counsel agreed that this assault could have occurred during the charging period. Indeed, we don't see how he could have argued otherwise. The jury heard that Wilson lived with FT at the 6th Street house where the assault occurred for 185 days within the State's specified period.

That's one qualifying act, but two more are needed. See Wis. Stat. § 948.025(1)(b) (requiring "at least three" qualifying acts). During her videotaped forensic interview (submitted to the jury as substantive evidence), FT shared that Wilson performed at least two other sex acts fitting Wisconsin's definition of "sexual intercourse" without specifying when or where those acts occurred. First, she said that Wilson "pulled his pants down" and "put his private part in my mouth," which felt "nasty." She said that he "tried to open [her] mouth so that he could pee in [her] mouth" and that "he peed on [her] hair," which looked like "spit" that she had to wipe off.

Second, FT stated that, on another occasion, Wilson made her "open up her legs," touched her with his "nasty fingers" and "digged in there," and made her "touch his private part." And she went further, demonstrating Wilson's actions by placing a male doll on top of a little girl doll.

Given this video evidence, we disagree with Wilson's contention that FT's trial testimony conclusively shows that the rest of the qualifying acts occurred outside the State's specified timeframe. If anything, FT's statements at trial and in the video were merely inconsistent. The jury could have resolved that inconsistency by crediting FT's testimony about what acts occurred but discounting her accounts of *where* or *when* they occurred.

At trial, FT testified about at least four different instances of sexual abuse that occurred at "Anthony's Granny's house." But recall that FT stayed at that house for less than a week before she and the other children were removed. Given the limited timeframe in which she lived there with Wilson, a rational jury could have found FT mistaken on the location or dates of her abuse. Such confusion would not be uncommon for a child, especially one with special needs suffering from repeated acts of sexual abuse across several homes. Cf. *State v. Schultz*, 939 N.W.2d 519, 538 (Wis. 2020) ("[C]hildren are often incapable of remembering traumatic incidents by the day, week, or month … ."); *State v. Fawcett*, 426 N.W.2d 91, 94 (Wis. Ct. App. 1988) ("Young children cannot be held to an adult's ability to comprehend and recall dates and other specifics.").

Indeed, the jury saw for itself that this might have been the case. In her forensic interview on May 28, 2014, FT repeatedly referred to events happening "last night," "this morning," "yesterday," and "today," even though she was living with a foster family at the time of the interview. So a rational jury could have easily inferred that the acts occurred during the State's specified timeframe. And we have no reason to doubt that the jury carefully weighed the number of qualifying acts; indeed, it rejected the lesser included offense instruction that would have allowed it to convict Wilson for only one—rather than three—acts.

In sum, the Wisconsin Court of Appeals reasonably found that a rational jury could view the evidence before it as enough to satisfy the three requisite acts of sexual assault. AEDPA deference therefore applies, so we reject Wilson's sufficiency-of-the-evidence claim.

III

We now turn to Wilson's second claim: that his counsel's performance fell below the constitutional minimum. Our review is once again limited by AEDPA under 28 U.S.C. § 2254(d)(1). The clearly established precedent here is *Strickland v. Washington*, 466 U.S. 668 (1984), which held that a criminal defendant's Sixth Amendment right to counsel may be violated by his counsel's deficient performance.

To establish a *Strickland* violation, a prisoner must show: (1) deficient performance and (2) prejudice resulting from it. *Id.* at 687; *Corral v. Foster*, 4 F.4th 576, 581 (7th Cir. 2021). In considering a *Strickland*-based habeas petition, which necessarily involves "general, fact-driven standards," "deference to the state court should … be[] near its apex." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2560 (2018) (per curiam); see *Brown*, 142 S. Ct. at 1530 ("[W]hen it comes to AEDPA, the more general the federal rule, the more leeway state courts have in reaching outcomes in case-by-case determinations before their decisions can be fairly labeled unreasonable.") (citation omitted and cleaned up).

Wilson contends that his trial counsel's performance was constitutionally deficient for two reasons. First, he argues that his counsel should have objected to the admission of notes in FT's medical record on Confrontation Clause grounds. And second, he insists that his counsel should have objected to certain "profile" testimony as unfairly prejudicial. We address and reject each contention in turn.

A

During FT's May 20, 2014 examination with pediatric nurse practitioner Debra Bretl, Bretl took notes recording that

FT had five "lesions in her genital region" and that FT cried, "Someone did this to me," and "Take it out." Laboratory testing later revealed that FT had antibodies for Type I herpes (a disease Wilson also had). At trial, FT's medical records were admitted without objection, and Dr. Guinn read Nurse Bretl's notes into the record. After the State closed its case, Wilson's counsel argued that Nurse Bretl needed to testify. But the trial judge rejected that argument. On appeal, the Wisconsin Court of Appeals found that Wilson's counsel's performance was adequate because FT's medical records were nontestimonial and thus did not violate the Confrontation Clause.

Wilson argues that the Wisconsin Court of Appeals unreasonably applied *Strickland* in reaching this holding. To start, Wilson asks us to ignore the fact that his counsel *did* object to the admission of Nurse Bretl's notes due to her absence. But even if we agreed to ignore that fact (say, because Wilson's counsel did not timely or clearly raise the objection), it's evident that a fairminded jurist could reach the same conclusion as the Wisconsin Court of Appeals. See *Brown*, 142 S. Ct. at 1525.

The Sixth Amendment guarantees the accused in a criminal prosecution "the right … to be confronted with the witnesses against him," which prevents the admission of testimonial evidence absent confrontation. U.S. Const. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Yet the amendment offers no similar protection for nontestimonial statements. See *Crawford*, 541 U.S. at 68. Beyond certain "core" categories of protected testimonial statements, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (citing *Crawford*, 541 U.S. at 51–52), the Supreme Court determines whether a statement is testimonial by looking to its "primary purpose," *Ohio*

*v. Clark*, 576 U.S. 237, 244 (2015) (citation omitted). If a declarant makes a statement primarily intending for it to establish some fact in a criminal prosecution, then the statement is testimonial. Cf. *id.* at 237, 244, 247 (holding that preschooler's statements to teacher were nontestimonial because the teacher's questions were aimed "to protect the victim from future attacks" and not to "arrest or punish" the abuser).

As relevant here, the Court has said that "medical reports created for treatment purposes … would not be testimonial." *Melendez-Diaz*, 564 U.S. at 312 n.2; see *Bullcoming v. New Mexico*, 564 U.S. 647, 672 (2011) (suggesting that reports "necessary to provide … medical treatment" are not testimonial); *Giles v. California*, 554 U.S. 353, 376 (2008) ("[S]tatements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules[.]"). To determine whether a medical report has been made for treatment purposes, we ask "whether there is an objectively ascertainable medical reason for the inquiry." *United States v. Norwood*, 982 F.3d 1032, 1050 (7th Cir. 2020). And we've said that when a medical provider asks a "victim who has suffered assault or injury" what happened, "[t]he primary purpose … is to provide medical treatment, not to further an investigation." *Id.*

In Wilson's view, two admitted pieces of evidence were testimonial: (1) Nurse Bretl's notes about her examination of FT and (2) FT's positive herpes test. We think the Wisconsin Court of Appeals reasonably found both nontestimonial.

A fairminded jurist could have found Nurse Bretl's notes nontestimonial for several reasons. First, Bretl took her notes before any sexual abuse was suspected and before any suspect, let alone Wilson, was identified. Nurse Bretl examined FT on May 20, 2014, the day all five children were removed

from Yegger's custody and evaluated at what was "basically … a checkup at the doctor" and a "standard procedure for when [a] child is removed [from a] home and placed in foster care." By the date of Bretl's examination, no one had leveled sexual abuse allegations against Wilson, nor had FT reported any sexual abuse. It's thus unlikely that Nurse Bretl recorded her observations with an eye towards Wilson's later trial. See *Williams v. Illinois*, 567 U.S. 50, 58 (2012) (plurality opinion) (finding it significant that DNA report "was produced before any suspect was identified").

Second, Nurse Bretl was not a law enforcement officer, and the setting which generated Bretl's notes did not resemble a formal interrogation. Although the parties call Nurse Bretl a "sexual assault nurse examiner" (SANE), see *Norwood*, 982 F.3d at 1046 (noting that a SANE "can serve both a medical and investigative function"), we haven't found that term in the record outside the government's opening and closing arguments. All we know from the record evidence is that Bretl was a pediatric nurse practitioner. And even if Bretl were a SANE, nothing suggests that she was "principally charged with uncovering and prosecuting criminal behavior" rather than performing medical care. *Clark*, 576 U.S. at 249. Without contrary evidence, we presume that "physicians and nurses' primary concern is the treatment of their patients." *Norwood*, 982 F.3d at 1049.

Moreover, we lack evidence that the setting in which Bretl performed her examination of FT resembled a formal interrogation. From what we can tell, no police officer joined FT for the examination. See *id.* at 1049 (a statement is less likely to be testimonial "when the only people in the room are the medical provider and the victim"). And if the examination was

anything like Dr. Guinn's (performed at the same center three days later), then it certainly did not resemble a formal interrogation. Dr. Guinn testified that her examination did not seek to prove sexual abuse and that she asked FT no questions about what happened. In Dr. Guinn's view, those tasks were better performed by a professional, trained interviewer, such as the one who questioned FT on May 28 (the day she first identified Wilson as her abuser). For these reasons, a fairminded jurist could hold Nurse Bretl's notes nontestimonial because she made them for the primary purpose of providing medical treatment, not to further a criminal investigation. See *id.* at 1050.

We reach the same conclusion for FT's herpes testing. Dr. Guinn (who ordered the testing) testified that the Hospital "routinely test[s] for" sexually transmitted diseases, that she "did not ask [FT] about what happened when [she] examined her," and that she was "not looking to prove sexual abuse." There was thus "an objectively ascertainable medical reason" for the testing—to diagnose FT so that she could receive proper treatment for her lesions. *Id.* And even if Dr. Guinn intended to address sexual abuse through the STD testing, a fairminded jurist could conclude that she "primarily aimed at identifying and ending the threat" and "meant … to protect [FT] from future attacks," rather than using this as evidence in a later prosecution. *Clark*, 576 U.S. at 247. A fairminded jurist, after finding no Confrontation Clause violation, could also conclude that Wilson's counsel was not deficient in failing to object to these medical records. So the Wisconsin Court of Appeals' decision requires deference under AEDPA.

B

We now turn to Wilson's argument that his counsel should have objected to certain "profile" testimony as unfairly prejudicial. One of the State's experts testified that "interfamilial sexual abuse" is the "most common type of sexual abuse" she sees and agreed that a mother's boyfriend would fit into this category. Another testified that the "vast majority of cases of sexual abuse" of children involve perpetrators "who are either relatives or acquaintances" of the child. The Wisconsin Court of Appeals found this evidence relevant and concluded that counsel's failure to object did not constitute deficient performance or cause unfair prejudice.

We need address only the unfair prejudice aspect of the Wisconsin Court of Appeals' decision. Even if Wilson's counsel acted deficiently in not objecting, a fairminded jurist could conclude that Wilson suffered no prejudice because there was not "a reasonable probability" that, "but for counsel's … error[], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. These experts added little to the State's case. A reasonable person would likely know that relatives and acquaintances are a frequent source of child abuse (after all, these are the people with unsupervised access to children). And in any event, the rest of the evidence against Wilson was far more damning than the expert testimony. In her trial testimony and recorded interview taken near the time of the abuse, FT described at least eight sex acts performed by Wilson in graphic detail. Moreover, both Wilson and FT had genital herpes, not a common diagnosis for an eight-year-old child. With such powerful evidence before the jury, we see no reasonable probability that a juror would change their mind had the challenged expert testimony been

excluded. We thus hold that the Wisconsin Court of Appeals did not unreasonably apply *Strickland*'s prejudice prong and that we must accordingly defer to its denial of Wilson's claim.

AFFIRMED